Judge OHLSON
delivered the opinion of the Court.
We granted review in this case to determine whether the military judge abused his discretion when he allowed a putative expert witness to testify at trial. Under the unusual set of circumstances present in this case, we conclude that the military judge did abuse his discretion by admitting this testimony, and that this error likely had a substantial influence on the panel members’ findings.
In the summer of 2010, Appellant was a specialist in the U.S. Army and lived in on-base housing at Dugway Proving Ground in Utah. A family with two teenage children— a sixteen-year-old girl (S.A.) and her younger brother — lived across the street. The Government alleged at trial that on June 29, 2010, Appellant invited these two teenagers to his home and plied them with alcohol. They became intoxicated and eventually returned to their own home and went to bed. After midnight, Appellant went to the teenagers’ house and crawled in the bedroom window of the sleeping S.A. without her knowledge or permission. She awoke to find Appellant removing her pants. Appellant then pressed his body against S.A., covered her mouth with his own, and held down her wrists as he proceeded to engage in noncon-sensual sexual intercourse with her. S.A. later stated that although she struggled with Appellant she did not fight back more fiercely or call out for help because she was drunk, confused, scared, and embarrassed. Appellant ultimately left the home without anyone other than S.A. knowing of his presence. S.A. telephoned a friend about thirty minutes after the incident, however, and the next morning this friend and the friend’s mother notified local law enforcement.
In contrast to the Government’s version of events, Appellant testified that S.A. had invited him to come to her bedroom on the night in question and that the sex was consensual. In seeking to corroborate the consensual nature of the encounter, defense counsel established through the combined testimony of several witnesses that S.A.’s brother was sleeping in an adjoining room— with the door between these two rooms ajar — and yet S.A. did not alert her brother to Appellant’s presence. During closing arguments, defense counsel also pointed out that even after Appellant had left the premises, S.A. did not immediately notify her parents or the police about the alleged sexual assault. Appellant also testified that S.A. had a motive for falsely accusing him of sexual assault, noting that he had told her of his disapproval of her drag use, and she may have been afraid that he would report this illegal activity to her parents.
At his court-martial, Appellant was charged with aggravated sexual assault, burglary, and two specifications of furnishing alcohol to a minor, in violation of Articles 120, 129, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 929, 934 (2006). Appellant pleaded guilty to the latter two specifications involving the alcohol, but not guilty to the other two charges. A general court-martial with enlisted members eventually found Appellant not guilty of the burglary charge but guilty of the sexual assault charge. The panel sentenced Appellant to confinement for seven years, forfeiture of all pay and allowances, reduction to the grade of E-l, and a dishonorable discharge. The convening authority approved the sentence as adjudged. Upon review, the United States Army Court of Criminal Appeals (CCA) affirmed the findings of guilty and the sentence. United States v. Flesher, No. ARMY 20110449, slip op. at 1 (A.Ct.Crim. App. May 30, 2013).
In the course of the trial, the military judge permitted the Government to call a *307 Sexual Assault Response Coordinator (SARC) as an expert witness. The Government represented to the military judge that the purpose for calling the SARC was to elicit testimony that, based on her work with thousands of sexual assault victims, it is common for sexual assault victims not to fight back against their attacker, not to scream or call for help, and not to first report the sexual assault to the police rather than to a friend or family member. However, the military judge did not handle in a textbook manner the issues of whether the SARC was truly an expert, the subject and scope of her testimony, whether her testimony in this case was relevant and reliable, and whether its probative value outweighed its potential prejudicial effect. Further, when the SARC’s testimony blatantly exceeded the scope of that which had been approved by the military judge, the trial counsel took no action to rein her in and the military judge provided no curative instruction to the panel.
It is the testimony of this putative expert that is the crux of the matter before us. Specifically, on Appellant’s petition we granted review of the following issue:
Whether the military judge abused his discretion when he admitted the testimony of a putative expert witness in violation of the Military Rules of Evidence and case law on bolstering, expert qualifications, relevance, and the appropriate content and scope of expert testimony.
As explained in greater detail below, we find that the military judge did abuse his discretion in handling this matter, and that this error was prejudicial to Appellant. Accordingly, we affirm in part and reverse in part.
BACKGROUND
On May 19, 2011, two weeks prior to the beginning of Appellant’s court-martial, the Government provided defense counsel with a witness list. This list included Ms. Sarah Falk, a former SARC at Fort Carson, Colorado. However, the Government did not identify Ms. Falk other than to note her current place of employment. Defense counsel contacted Ms. Falk and interviewed her. Defense counsel then contacted trial counsel to ask if he intended to call Ms. Falk as an expert witness. Based on these conversations, defense counsel moved for a continuance, noting the recent notification of the Government’s intent to call an expert witness and arguing that the defense needed more time to prepare for Ms. Falk’s expected testimony. The Government opposed the defense’s motion via e-mail to the military judge, stating that Ms. Falk would not interview the victim or testify about the “psychology of trauma,” but instead would testify about the “common behaviors and responses” of sexual assault victims. The defense filed a reply brief the next day. In this reply, the defense specifically asked for a hearing pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because Ms. Falk’s testimony appeared to “lack any scientific methodology.” [1]
Two days later the military judge sent an e-mail to counsel on both sides. In the email the military judge addressed the defense’s request for a continuance:
Re: the Defense motion for a continuance — As I understand the issue, Ms. Falk is going to testify she has seen lots of alleged sexual assault victims. Some act this way, some act that way, and the way some alleged victims act might not be consistent with how one would think they would act. Is this correct, Gov’t? If so, Defense, I would guess that Ms. Falk will agree on cross that there is no usual way alleged victims react. Each alleged victim is different. I would also think you could get any [Sexual Assault Nurse Examiner] *308 (for example) between now and next week to come in and testify to that. It doesn’t take any preparation. If I am correct in all of this, why do you need a delay?
This e-mail from the military judge did not address the question of the admissibility of Ms. Falk’s testimony; it merely assumed it. The military judge also failed to explicitly rule one way or another on the Motion for Continuance.
Defense counsel responded via e-mail and reiterated the defense’s contention that Ms. Falk’s testimony was “not proper expert testimony.” Defense counsel again requested “a Daubert hearing regarding [Ms. Falk’s] methodology before she be allowed to testify as an expert on the behaviors of the alleged rape victims.” He also requested discovery from Ms. Falk.
The next day the military judge sent another e-mail. In response to the defense’s request for a hearing and discovery he wrote:
Regarding Ms. Falk: Defense, you can interview her for that information. I will consider any motions or arguments you present, but it is unlikely we will have a Daubert hearing. The Gov’t confirmed my understanding of her testimony. She is simply going to say she has seen the different way alleged victims react.
In response to the military judge’s e-mail, on May 28, defense counsel filed a Motion to Compel Expert or to Exclude Expert Testimony. In this motion the defense argued that Ms. Falk’s testimony should be excluded pursuant to Military Rules of Evidence (M.R.E.) 402 and 403 because it was not relevant and presented a substantial risk of unfair prejudice that outweighed its probative value. In the alternative, if Ms. Falk’s testimony was allowed, the defense asked the court to appoint Dr. Thomas Grieger, a putative expert in counterintuitive behaviors, as an expert for the defense. There is no indication in the record that the military judge took any formal action on the defense’s motion to compel Dr. Grieger or exclude Ms. Falk until the morning of trial.
The case proceeded to trial on the original trial date of June 1. The military judge began the court-martial with an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2012), session. During this session, the military judge put on the record a summary of the e-mails that had been exchanged between the parties as well as the in-chambers conference that had been held that morning pursuant to M.R.E. 802. The military judge explained that he did not grant the defense’s motion for a continuance because he believed that Ms. Falk’s testimony would be very limited:
[M]y understanding was that they were going to ask several things. “Have you observed alleged victims? How many in the past?” And, “Some act this way; some act that way.” And, “No two victims are the same.” When I sent back the email saying, “Is that correct, Counsel?” they confirmed that is correct. And what I indicated to the defense at that time was, based on that, I was not inclined to grant a continuance....
The military judge further explained that the defense’s'motion to compel the production of Dr. Grieger was without merit because the Government had provided, in lieu of Dr. Grieger, a Sexual Assault Nurse Examiner (SANE) who could provide the same testimony.[2] When the military judge finished summarizing the past proceedings, both counsel stated that they had no objections to this summary.
At this point, defense counsel requested “the chance, to voir dire the expert witness from the [Government before she is brought in front of the panel.” This request set off another round of discussions about whether or not the defense’s requested expert, Dr. Grieger, was necessary in light of the limited nature of Ms. Falk’s expected testimony. The defense argued that regardless of the terminology used, Ms. Falk would be providing testimony on the counterintuitive behav *309 iors of sexual assault victims. The defense’s position was that such testimony is complex, scientific testimony that requires specialized expertise not possessed by the assigned SANE. The Government responded that Ms. Falk would not be providing specialized scientific testimony about the operation of a victim’s brain, but rather would testify based on her professional experience as a SARC as follows: “I deal with victims and this is what I see from the whatever many victims I’ve viewed.” The Government further asserted that its expert witness would testify only “regarding scream, non-stranger, and not reporting to law enforcement.” The following colloquy then ensued:
MJ: And my understanding, Government, you are not going to ask your expert about why say, for example, she didn’t scream? My understanding was you were just going to ask her: How many have you done? I have seen a hundred. Is it unusual for an alleged victim not to scream? No that is not unusual.
ATC: Correct—
MJ: Not to say this is why they don’t scream.
ATC: Exactly, Your Honor. Just to provide that basis, somebody who deals with—
MJ: Sure. Okay.
DC: Your honor, the defense would argue if that’s the extent of it, that it would also be irrelevant_ What we are interested in is what happened in this case.
ATC: And, Your Honor, if in any[ ]way the defense case comes up and she didn’t scream for her mother or she didn’t call 911 immediately, you know, without that testimony we are kind of lost. Our case in chief is defici[en]t without that testimony coming in.
MJ: And, Defense, based on my experience all these experts will say some scream, some don’t, some delay reporting, some report immediately, and I would think that the government’s expert would admit all that on cross-examination. Say, yeah, some people scream, some don’t, some delay reporting, and some don’t.
... But again, Government, your expert is not going to testify about this is why she wouldn’t have screamed, or this is why some victims don’t scream.
ATC: No, Your Honor.
MJ: She is not going to say any of that.
ATC: That is well beyond her expertise. I mean she could conjecture but it, obviously, wouldn’t be the same.
MJ: Right.
After some additional discussion, the military judge ruled on the motion to compel. Relying upon what he had “seen in the past” and the limits on Ms. Falk’s expected testimony, the military judge concluded that the SANE assigned to the defense could provide the same assistance as Dr. Grieger. The defense’s motion for its own expert was, therefore, denied. The questions raised pretrial about the admissibility of Ms. Falk’s expert testimony were not addressed at this point except with respect to the military judge’s statements concerning the narrow boundaries that he would impose on her testimony. The military judge made no explicit ruling on the motion to exclude Ms. Falk.
At the close of the Article 39(a), UCMJ, session, trial testimony began with S.A. and her brother. Defense counsel elicited testimony from both witnesses that S.A.’s brother had a habit of sleeping on the couch outside her room and that on the evening in question he was sleeping there with the door partially open. Next, the members were excused and another Article 39(a), UCMJ, session was called during which the parties conducted voir dire of Ms. Falk. In response to questions from defense counsel, Ms. Falk provided the court with the following information: she had a “sociology based” bachelor’s degree that did not involve clinical counseling; she had not conducted any clinical counseling for sexual assault victims, but instead had “advocated for” what she estimated to be a “couple thousand” such individuals; “[m]ore than a third” of these cases had resulted in a court-martial or a civilian trial; “at least a fourth” of those eases had ended in a convic *310 tion; she was “confident” that “the majority” of the individuals who stated that they had been sexually assaulted were “telling the truth”; and her role as a SARC was not to investigate allegations of sexual assault but instead to “walk [victims] through the process and ensure they know what their options and resources are.”
The military judge then urged trial counsel to “ask the witness the three things I believe you said you were going to have her testify about.” Trial counsel reeled off the following list:
The questions I do intend to ask this witness [are] based on all the victims she has seen; how often does a victim scream or not scream; how often is the most she has seen; and how many fight back or don’t fight; how many involve a stranger versus a non-stranger, someone they met at some point in some way; and then how many she’s seen where the first report or the first outcry is to law enforcement as opposed to anyone else other than law enforcement.
However, the military judge did not require trial counsel to actually pose any of these specific questions to Ms. Falk, and she provided no answers to them during this Article 39(a), UCMJ, session. The military judge simply asked, “Any other questions based on that?” After a few additional background questions by counsel for both parties, Ms. Falk was excused.
Without hearing Ms. Falk’s expected testimony in her own words or any arguments about the admissibility of Ms. Falk’s testimony pursuant to the Military Rules of Evidence (M.R.E.) — or pursuant to the holdings in Daubert or Houser[3] — and without giving any explanation of his reasoning, the military judge then made his ruling:
Government, I am going to let you ask three things. The ones about whether or not that most victims put up a fight or not; scream or not; and who their first report is made to, law enforcement or not law enforcement. But I am not going to let you ask about whether or not most cases it is a stranger or not.
Defense counsel objected on the grounds of relevance. The military judge “noted” the objection, but did not sustain or overrule the objection.
When the members returned, the court heard testimony from S.A.’s stepfather, and then Ms. Falk took the stand. Trial counsel reviewed her educational and professional experience, which included a bachelor’s degree in law and society, her work towards a graduate certificate in public policy, and both her civilian and military training in “victim services.” Ms. Falk testified that she worked previously as the SARC at Fort Carson. As Ms. Falk explained it, a SARC’s job is to “make contact with the victim upon receipt of a report of sexual assault. You walk them through the medical, legal and investigative processes.” Ms. Falk testified that she had personally worked with “thousands” of victims of sexual assault. The Government then asked to have Ms. Falk recognized as an expert in “sexual assault victim responses.” The defense renewed its objection “as previously stated” to Ms. Falk’s admission as an expert. The military judge then said:
MJ: Ms. Falk will be recognized as an expert in sexual assault — as a sexual assault response coordinator.
ATC: Thank you, Your Honor.
MJ: Not in sexual assault victim responses or however you put it.
The remainder of Ms. Falk’s testimony on direct examination was very limited. The expert testimony at the center of this appeal consists primarily of three short questions and answers:
*311 Q: ... In your experience in dealing with victims, how often have you had a sexual assault victim who has fought back against their attacker?
A: Almost never. And it’s generally with an unknown subject, with somebody that that person isn’t familiar with; it’s a stranger.
Q: In your experience in dealing with victims, how often have you had a sexual assault victim who at the time of the assault screamed or called for help?
A:' Again, almost never. And, you know, they report afterwards that generally there is the fear of escalating the violence or fear that they are going to be harmed even worse than they already are if they yell or scream for help or upset the individual.
Q: Okay. In your experience, how often does a victim report first to law enforcement? The first person they call is law enforcement.
A: I can’t think of a specific ease where they do report specifically to law enforcement. It’s just not something common. They generally are going to go to a friend or a family member.
DISCUSSION
I. Standard of Review
We review de novo the question of whether the military judge properly performed the required gatekeeping function of M.R.E. 702. Griffin, 50 M.J. at 284. That is, we must determine de novo whether the military judge “properly followed the Dau-bert framework.” Id. However, we review for abuse of discretion the decision by the military judge to permit Ms. Falk to testify as an expert witness, the limitations he placed on the scope of her permitted testimony, and his enforcement of those limitations. United States v. Billings, 61 M.J. 163, 166-67 (C.A.A.F.2005).
A military judge abuses his discretion when his findings of fact are clearly erroneous, the court’s decision is influenced by an eiToneous view of the law, or the military judge’s decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law.
United States v. Miller, 66 M.J. 306, 307 (C.A.A.F.2008). “An ‘abuse of discretion’ exists where ‘reasons or rulings of the’ military judge are ‘clearly untenable and ... deprive a party of a substantial right such as to amount to a denial of justice’; it ‘does not imply an improper motive, willful purpose or intentional wrong.’” United States v. Travers, 25 M.J. 61, 62 (C.M.A.1987) (alteration in original) (quoting Guggenmos v. Guggenmos, 218 Neb. 746, 359 N.W.2d 87, 90 (1984)).
II. The Record of Trial
We begin by noting that the military judge did not approach his evidentiary rulings in a methodical manner. Rule for Courts-Martial (R.C.M.) 801(a)(4) says that the military judge “shall ... rule on all interlocutory questions and all questions of law raised during the court-martial.” R.C.M. 801(f) further states that “[a]ll sessions involving rulings ... made ... by the military judge ... shall be made a part of the record.” R.C.M. 905(d), which governs motions, states that “[a] motion made before pleas are entered shall be determined before pleas are entered unless ... the military judge for good cause orders that determination be deferred until trial of the general issue or after findings.” R.C.M. 905(d) further states, “[w]here factual issues are involved in determining a motion, the military judge shall state the essential findings on the record.”
We have previously held that objections made at trial may not be “evaded or ignored.” United States v. DeYoung, 29 M.J. 78, 80 (C.M.A.1989). It is the duty of the, military judge to “affirmatively” rule. Id.; see also United States v. Mullens; 29 M.J. 398, 399 (C.M.A.1990) (“We again hold that the military judge is required by Article 51(b) ... and R.C.M. 801(a)(4) ... to rule on these objections.”).' Further, we have previously explained why it is necessary for the military judge to make a clear record. “We do not expect record dissertations but, rather, a clear signal that the military judge *312 applied the right law. While not required, where the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted.” United States v. Downing, 56 M.J. 419, 422 (C.A.A.F.2002); see also United States v. Winckelmann, 73 M.J. 11, 16 (C.A.A.F.2013) (“The Court of Criminal Appeals did not detail its analysis in this ease; nor was it obligated to do so. Going forward, however, a reasoned analysis will be given greater deference than otherwise.”).
However, the reverse is also true. If the military judge fails to place his findings and analysis on the record, less deference will be accorded. As the United States Army Court of Criminal Appeals has recognized:
When the standard of review is abuse of discretion, and we do not have the benefit of the military judge’s analysis of the facts before him, we cannot grant the great deference we generally accord to a trial judge’s factual findings because we have no factual findings to review. Nor do we have the benefit of the military judge’s legal reasoning in determining whether he abused his discretion....
United States v. Benton, 54 M.J. 717, 725 (A.Ct.Crim.App.2001) (citations omitted).
The predecessor to the United States Air Force Court of Criminal Appeals has similarly explained the difficulties faced by an appellate court when the military judge fails to comply with R.C.M. 905(d). “Without a proper statement of essential findings, it is very difficult for an appellate court to determine the facts relied upon, whether the appropriate legal standards were applied or misapplied, and whether the decision amounts to an abuse of discretion or legal error.” United States v. Reinecke, 30 M.J. 1010, 1015 (A.F.C.M.R.1990), rev’d on other grounds by United States v. Strozier, 31 M.J. 283 (C.M.A.1990); see also United States v. Doucet, 43 M.J. 656, 659 (N.-M.Ct.Crim.App.1995) (“When factual issues are involved in ruling on a motion, a trial judge has a mandatory sua sponte duty to state the ‘essential findings’ on the record which support his or her ruling.” (citations omitted)).[4]
Here, the military judge delayed ruling on the defense’s request for a continuance and the defense’s motion to compel Dr. Grieger until the morning of trial, denied the motion to compel based on his experience in other eases rather than strictly on the facts of this particular case, did not affirmatively address the defense’s request for a Daubert hearing, did not address the Houser factors, did not explicitly deny on the record the defense’s motion to exclude the testimony of Ms. Falk, did not provide any findings, of fact, and did not apply the law to the facts to support his decision to admit Ms. Falk’s expert testimony. Of these concerns, the most important is the fact that the military judge did not conduct even a rudimentary Daubert hearing — despite the fact that the defense specifically and repeatedly requested one — or even briefly address the various Houser factors. As a result, we are left with a limited understanding of the military judge’s decision-making process and, accordingly, we give his decisions in this case less deference than we otherwise would.
To be clear, we do not hold that a military judge is always required to conduct a formal Daubert hearing or to precisely address each of the factors spelled out in Houser when deciding whether and how a proffered expert should testify. United States v. Sanchez, 65 M.J. 145, 149 (C.A.A.F.2007) (quoting Daubert, 509 U.S. at 594, 113 S.Ct. 2786). “The inquiry is ‘a flexible one.’ ” Id. Further, in regard to our de novo review of the process in the instant case, because the military judge did permit voir dire and placed substantial limitation on the expert *313 testimony, we ultimately conclude that the military judge did perform an adequate, if not exemplary, preliminary gatekeeping inquiry. Nevertheless, we find that the analytical structure developed in the Houser and Daubert cases is quite helpful — both at the trial and at the appellate level — in determining the appropriateness of admitting expert testimony. Therefore, we use that structure below in deciding the issue before us. Moreover, we note that when a military judge does not hold a Daubert hearing and does not address the Houser factors in some manner, we will generally show less deference to that military judge’s decisions.
III. Analysis
A Military Rule of Evidence 702
As a threshold matter, when deciding whether Ms. Falk would be allowed to testify, the military judge was obligated to determine whether her testimony would be helpful to the panel. M.R.E. 702 states that an expert witness may provide testimony if it “will assist the trier of fact to understand the evidence or determine a fact in issue.” Thus, an expert may testify if his or her testimony is “helpful.” Billings, 61 M.J. at 166. “A suggested ‘test’ for deciding ‘when experts may be used’ is “whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject....’ ” United States v. Meeks, 35 M.J. 64, 68 (C.M.A.1992) (alteration in original) (quoting Fed.R.Evid. 702 advisory committee’s note).
In the past we have made it clear that expert testimony about the sometimes coun-terintuitive behaviors of sexual assault or sexual abuse victims is allowed because it “assists jurors in disabusing themselves of widely held misconceptions.” Houser, 36 M.J. at 398; see also United States v. Halford, 50 M.J. 402, 404 (C.A.A.F.1999) (rape trauma syndrome evidence allowed to explain common behavioral characteristics in “cases of non-eonsensual sexual encounters”); United States v. Peel, 29 M.J. 235, 241 (C.M.A.1989), cert. denied, 493 U.S. 1025, 110 S.Ct. 731, 107 L.Ed.2d 750 (1990) (allowing expert to testify that “it was not inconsistent behavior for a rape victim not to immediately] report the offense” or to “act[ ] as if the rape had never happened”); United States v. Reynolds, 29 M.J. 105, 108 (C.M.A.1989) (allowing clinical psychologist to testify in order to “counter any adverse inferences which might be drawn from the fact that the victim did not immediately report the offense”); United States v. Carter, 26 M.J. 428, 429 (C.M.A.1988) (holding that rape trauma syndrome evidence meets the requirements of M.R.E. 702); cf. United States v. Rynning, 47 M.J. 420, 422 (C.A.A.F.1998) (recognizing that expert testimony explaining the “behavioral characteristics or behavioral patterns of an alleged sexual abuse victim,” is helpful “ ‘especially where that behavior would seem to be counterintuitive’” (citation omitted)).
We again affirm the appropriateness of allowing expert testimony on rape trauma syndrome where it helps the trier of fact understand common behaviors of sexual assault victims that might otherwise seem counterintuitive or consistent with consent. However, it is questionable whether Ms. Falk’s testimony was truly helpful under the particular circumstances present in the instant case.
To begin with, Ms. Falk was not an expert in rape trauma syndrome. Indeed, trial counsel conceded that point, and the military judge explicitly sought to limit Ms. Falk’s testimony to such unexceptional observations as “some [people] scream, some don’t, some delay reporting, and some don’t.” Additionally, the military judge admitted that this limited set of observations was “almost common knowledge.” Further, S.A herself testified explicitly and clearly about why she reacted the way she did both' during and after the incident with Appellant. Each of these points thus diminishes the “helpfulness” of Ms. Falk’s testimony. However, we ultimately conclude that the limited type of testimony that Ms. Falk was supposed to provide, even when it is elicited from a person with Ms. Falk’s qualifications, may be appropriate in certain circumstances. We thus proceed to the question of whether the record before *314 us makes it clear that this particular case presented such circumstances.
B. The Houser Factors[5]
1. Qualifications of the Expert
The military judge placed little focus on the foundational question of whether Ms. Falk truly was an “expert witness.” There are several possible explanations for this inattention. Perhaps the military judge thought he did not need to explore this issue in depth because the M.R.E. are quite broad in defining an expert as someone who is qualified based on that individual’s “knowledge, skill, experience, training, or education.” M.R.E. 702. The military judge also may have believed that Ms. Falk’s qualifications were sufficiently established because he intended to greatly circumscribe the nature and breadth of Ms. Falk’s testimony. Furthermore, the military judge’s prior experience with sexual assault experts may have led him to believe he understood the quality of Ms. Falk’s credentials and the nature and scope of her pending testimony. However, we note that the admission of a putative expert’s testimony may be of utmost significance in any criminal trial. Daubert, 509 U.S. at 595, 113 S.Ct. 2786 (“Expert evidence can be both powerful and quite misleading.”) (citation and internal quotation marks omitted). Thus, a trial judge must first assure himself or herself that a proffered expert is truly an expert. See United States v. Cauley, 45 M.J. 353, 357 (C.A.A.F.1996) (holding that it was not error to refuse to allow a police detective to testify on the common behaviors of rape victims); Carter, 26 M.J. at 430 (holding that it was error to allow a United States Army Criminal Investigation Command (CID) agent to offer expert testimony on the common behaviors of rape victims).
We further note that the record reflects significant confusion between the military judge and the trial counsel about the exact nature of Ms. Falk’s proffered expertise. After the Government asked to have Ms. Falk recognized as an expert in “sexual assault victim responses” the following colloquy ensued:
MJ: Ms. Falk will be recognized as an expert in sexual assault — as a sexual assault response coordinator.
ATC: Thank you, Your Honor.
MJ: Not in sexual assault victim responses or however you put it.
This exchange raises several questions. We first question how an individual can be characterized as an expert based simply on his or her job title. We next question whether there was ever a “meeting of the minds” between the military judge and the trial counsel about what Ms. Falk was an expert on, and thus we ultimately question whether there was ever a careful determination on the military judge’s part about the qualifications of Ms. Falk to serve as an expert witness in this particular case and under these particular circumstances. Finally, we note that the qualitative differences between this witness’s practical victim advocacy experience and the qualifications of witnesses in other cases where we have approved of testimony on counterintuitive behavior make it more difficult for us to summarily accept, without more specific factual findings and legal analysis of the issue on the record, the implied conclusion of the military judge that this witness was qualified to testify as she did.[6]

*315
2.Subject Matter of Expert Testimony

As stated above, in appropriate circumstances a military judge may allow an expert witness to testify regarding how victims may or may not behave following a sexual assault. Further, an appropriately qualified expert witness also may be able to testify why a sexual assault victim may or may not react in a particular manner. But in the instant case, the trial counsel conceded that Ms. Falk was not qualified to address the issue of why sexual assault victims may or may not behave in a certain way, and the military judge specifically ruled that Ms. Falk could not testify on this point.[7] And yet, Ms. Falk clearly did testify about why sexual assault victims may act in a certain manner,[8] and the trial counsel did not rein her in and the military judge did not issue a curative instruction.
We have previously held that an expert witness may not offer opinions that “exceed[ ] the scope of the witness’s expertise.” United States v. Birdsall, 47 M.J. 404, 410 (C.A.A.F.1998). As one federal court explained, an expert witness “must ‘stay within the reasonable confines of his [or her] subject area.’ ” Trilink Saw Chain v. Blount, Inc., 583 F.Supp.2d 1293, 1304 (N.D.Ga.2008) (quoting Lappe v. Am. Honda Motor. Co., 857 F.Supp. 222, 227 (N.D.N.Y.1994)). Other federal courts have reached the same conclusion. See, e.g., United States v. Brown, 415 F.3d 1257, 1269 (11th Cir.2005) (chemistry consultant not qualified as expert in controlled substances); Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715 (8th Cir.2001) (hydrologist specializing in flood risk management not qualified to testify as expert on safe warehousing practices); Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir.1997) (metallurgic engineer not qualified to testify as expert in design of safes). In this case, under these circumstances, it was error to permit Ms. Falk to testify as she did because her testimony went beyond the scope of her expertise as it was agreed to by the parties in advance of trial.
3. Basis for Expert Testimony
The third Houser factor addresses the facts and data that an expert is allowed to rely on when forming his or her opinion. Under M.R.E. 703, “an expert’s opinion may be based upon personal knowledge, assumed facts, documents supplied by other experts, or even listening to the testimony at trial.” Houser, 36 M.J. at 399 (citing United States v. Johnson, 35 M.J. 17, 18 (C.M.A.1992)). There is no dispute that Ms. Falk’s testimony was based on her personal experience as a SARC. However, we discuss below whether the reliability of Ms. Falk’s expert opinions, which were based solely on Ms. Falk’s personal experience with alleged victims, was properly considered by the military judge.
4. Relevance
During an Article 39(a), UCMJ, session, trial counsel made the somewhat startling argument to the military judge that Ms. Falk’s testimony was relevant because absent Ms. Falk’s testimony, “[o]ur ease in chief is *316 defici[en]t.” However, the military judge did not probe into why the Government’s case-in-ehief would be deficient and thus whether Ms. Falk’s testimony was truly relevant.
As noted supra, we previously have held that testimony on the counterintuitive behaviors of rape victims is relevant. However, in the instant ease, the military judge steadfastly refused to treat Ms. Falk’s testimony as testimony on counterintuitive behaviors. Instead, at each turn when the military judge acquiesced to the Government’s request to have Ms. Falk testify, he chipped away at the scope and the nature of her testimony. By so doing, he also chipped away at the relevance of Ms. Falk’s testimony, and he did so without stating on the record his reasoning. This state of affairs complicates our review of the matter.
5. Reliability
The Government, as the proponent of Ms. Falk’s expert testimony, had the burden of demonstrating the reliability of Ms. Falk’s testimony. Billings, 61 M.J. at 166. To show that an expert’s opinion is “ ‘connected to existing data’ ” by more than the “ ‘ipse dixit of the expert,’ ” the Government may rely on the four Daubert reliability factors or on “alternative indicia of reliability.” Id. at 168 (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).[9] And yet, there is little information in the record to indicate that the Government squarely addressed these points specifically, or the issue of Ms. Falk’s reliability more generally.
The Government did proffer that Ms. Falk would base her testimony on her personal interactions with individuals who were sexually assaulted, and M.R.E. 702 permits an expert to be qualified by reason of experience rather than skill, training, or education. In other words, “experience in a field may offer another path to expert status.” United States v. Frazier, 387 F.3d 1244, 1260-61 (11th Cir.2004). Even so, “the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is sufficient foundation rendering reliable any conceivable opinion the expert may express.” Id. at 1261 (emphasis added). As the Advisory Committee’s notes on Fed.R.Evid. 702 explain:
If the witness is relying solely or primarily on experience, then the witness must.explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts.
Fed.R.Evid. 702 advisory committee’s note (on 2000 amendments).[10] In other words, the military judge should have stated on the record why he concluded that Ms. Falk’s testimony was reliable.[11] And yet, the military judge did not do so.
6. Probative Value
Finally, there is virtually no evidence in the record that the military judge weighed the probative value of Ms. Falk’s pending testimony against its potential prejudicial effect. Indeed, the probative value of Ms. Falk’s testimony appears to have been quite limited. To begin with, it is an established principle “that expert testimony cannot be used solely to bolster the credibility of the government’s fact-witnesses by mirroring their version of events.” United States v. Cruz, 981 F.2d 659, 664 (2d Cir.1992). A military judge must distinguish between an expert witness whose testimony about behaviors of sexual assault victims that are subject *317 to “widely held misconceptions” will be helpful to the trier of fact, Houser, 36 M.J. at 398, and an expert witness whose testimony will simply mirror the specific facts of the case and serve only to bolster the credibility of a crucial fact witness. See United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir.1991) (“If the testimony is instead directed solely to ‘lay matters which a jury is capable of understanding and deciding without the expert’s help,’ the testimony is properly excludable.” (internal citation omitted)); see also Cauley, 45 M.J. at 358 (recognizing that “[e]xpert testimony on credibility is not admissible at courts-martial”); United States v. King, 35 M.J. 337, 342 (C.M.A.1992) (“[W]e do not allow witness opinion regarding the truthfulness of another person.”).[12]
In the instant case, S.A. gave a direct and credible explanation for why she did not scream or struggle more or immediately notify her parents of the sexual assault. Thus, Ms. Falk’s purported expert testimony was not helpful because the panel members could understand what had happened based on S.A.’s own explanation. Therefore, once the military judge had placed strict limitations on Ms. Falk’s testimony — which thereby rendered the observations of the expert witness “almost common knowledge” — its probative value had been severely eroded.
On the other hand, the prejudicial effect of Ms. Falk’s testimony was quite likely substantial in this case. This was a classic “he said-she said” case, with the two primary witnesses giving diametrically opposed testimony on the critical issue of whether the sexual intercourse was consensual. “[I]n cases of this sort where there is often a ‘one-on-one’ situation, anything bolstering the credibility of one party inherently attacks the credibility of the other....” United States v. August, 21 M.J. 363, 365 n. 4 (C.M.A.1986). Therefore, the danger of bolstering in this case was significant. More importantly, actual bolstering occurred in this case because after S.A. already had clearly and directly testified to the panel members why she did not struggle more with her assailant, Ms. Falk provided additional testimony on the same point of why victims do not struggle more with their attackers. This bolstering was of particular concern because even the Government conceded that Ms. Falk did not have a legitimate basis to testify on this point, and the military judge had explicitly placed such testimony by Ms. Falk off-limits.[13]

Summary

Thus, although limited testimony from a witness with qualifications similar to those of Ms. Falk may be appropriate in certain circumstance, we conclude that the military judge did not place sufficient evidence on the record to demonstrate that he acted within the bounds of his discretion when he authorized Ms. Falk to testify as an expert witness in the instant case. Therefore, we find that he erred. Finding error, we must test for prejudice.
C. Prejudice
Under Article 59(a), UCMJ, a “finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused.” *318 10 U.S.C. § 859(a) (2012); United States v. Yammine, 69 M.J. 70, 78 (C.A.A.F.2010). “The test for nonconstitutional evidentiary error is whether the error had a substantial influence on the findings.” United States v. Gunkle, 55 M.J. 26, 30 (C.A.A.F.2001) (citing Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Pollard, 38 M.J. 41, 52 (C.M.A.1993)). Importantly, it is the Government that bears the burden of demonstrating that the admission of erroneous evidence is harmless. United States v. Berry, 61 M.J. 91, 97-98 (C.A.A.F.2005).
To determine whether the Government has carried its burden, we weigh four factors: (1) the strength of the Government’s ease; (2) the strength of the defense’s case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question. Id. at 98.
Although these are four distinct factors, all of them revolve around one single point: namely, the central question at trial was whether S.A. consented to the sexual intercourse or whether Appellant forced himself on her or took advantage of her drunken state. The Government evidence on this issue consisted of S.A.’s clear testimony that she was drunk, that she did not invite Appellant to her room, that she did not consent to have sex with him, and that she repeatedly told him “no.” In juxtaposition, the defense put Appellant on the stand where he testified that the alleged assault was an invited, consensual sexual encounter. The result was a “he said-she said” case, where the outcome largely depended on whether the panel found S.A. or Appellant more credible.
Under this scenario, Ms. Falk’s testimony could have been of considerable significance in the minds of the panel members because it seemed to corroborate and ratify S.A.’s version of events. Therefore, we do not find that the Government has met its burden of demonstrating that Ms. Falk’s improperly admitted testimony “did not have a substantial influence on the ... findings.” Gunkle, 55 M.J. at 30.
DECISION
The decision of the United States Army Court of Criminal Appeals is affirmed in part and reversed in part. The part of the decision regarding Charge III and its Specifications is affirmed. The part of the decision affirming the finding of guilty to the offense of aggravated sexual assault and the sentence is reversed, and the finding of guilty to that offense and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing on the charge of aggravated sexual assault and the sentence is authorized.

. In Daubert, the United States Supreme Court held that a trial judge has a special obligation to "ensure that any and all scientific testimony ... is not only relevant, but reliable.” 509 U.S. at 589, 113 S.Ct. 2786. This "gatekeeping” requirement, as it is called, is intended to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

. A SANE is a nurse who has been trained to provide care to victims of sexual assault. A SANE performs a medical examination following the report of an assault, and identifies and documents injuries. A SANE also collects and preserves physical evidence that may be necessary for any judicial proceedings. See The Free Dictionary, http://medical-dictionary. thefreediction-ary.com/ sexual + assault + nurse+examiner (last visited June 26, 2014).

. In United States v. Houser, 36 M.J. 392 (C.M.A.1993), we set out six factors derived from the M.R.E. that must be established for expert testimony to be admissible. The Houser factors are: (1) the qualifications of the expert, (2) the subject matter of the expert testimony, (3) the basis for the expert testimony, (4) the legal relevance of the evidence, (5) the reliability of the evidence, and (6) whether the probative value of the testimony outweighs other considerations. Id. at 397. We view Daubert, which was decided two months after Houser, as "providing more detailed guidance on the - fourth and fifth Houser prongs pertaining to relevance and reliability.” United States v. Griffin, 50 M.J. 278, 284 (C.A.A.F.1999).

. While this Court has not had occasion to discuss the importance of a complete and detailed record in the context of a Daubert analysis, this issue has arisen in the federal courts of appeals. As the United States Court of Appeals for the Tenth Circuit explained, "For purposes of appellate review, a natural requirement of [the gate-keeping] function is the creation of 'a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law.' ” Goebel v. Denver & Rio Grande Western R.R. Co., 215 F.3d 1083, 1088 (10th Cir.2000) (citations omitted).

. The Houser factors were based in large part on M.R.E. 702 and 703. These rules were substantively amended in 2004 to conform with the federal rules, which had been amended to reflect the Supreme Court’s decisions in Daubert, 509 U.S. at 579, 113 S.Ct. 2786, and Kumho Tire, 526 U.S. at 137, 119 S.Ct. 1167. See Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-52 (2012 ed.) [hereinafter Drafters' Analysis]. We have said that Daubert provides "more detailed guidance on the fourth and fifth Houser prongs pertaining to relevance and reliability.” Griffin, 50 M.J. at 284; see also supra note 3. In the absence of briefing on this issue from either party, we leave for another day the question of how, if at all, the Houser factors were affected by the 2004 amendments.

. See, e.g., United States v. Pagel, 45 M.J. 64, 65 (C.A.A.F.1996) (doctor/clinical child psychologist admitted as expert in diagnosis and treatment of child sexual abuse); United States v. Marrie, 43 M.J. 35, 41 (C.A.A.F.1995) (doctor/licensed psychologist admitted as expert to testify regarding "typical patterns of disclosure by victims of sexu *315 al child abuse; the potential for false allegations; the possibility of influence on victims by outside coaching; and falsities that may occur when there are custody disputes”); Houser, 36 M.J. at 393 (doctor/counseling psychologist/associate professor admitted as expert to testify regarding rape trauma syndrome); United States v. Suarez, 35 M.J. 374, 375-76 (C.M.A.1992) (doctor/clinical psychologist admitted as an expert on child sexual abuse); United States v. Carter, 26 M.J. 428, 429 (C.M.A.1988) (medical doctor/division psychiatrist admitted as expert to testify regarding rape trauma syndrome).

.
MJ; But again, Government, your expert is not going to testify about this is why she wouldn’t have screamed, or this is why some victims don't scream.
ATC: No, Your Honor.
MJ: She is not going to say any of that.
ATC: That is well beyond her expertise.

.
Q: In your experience in dealing with victims, how often have yop had a sexual assault victim who at the time of the assault screamed or called for help?
A: Again, almost never. And, you know, they report afterwards that generally there is the fear of escalating the violence or fear that they are going to be harmed even worse than they already are if they yell or scream for help or upset the individual.

.The four reliability factors set out in Daubert are: (1) whether a theory or technique can be or has been tested; (2) Whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique’s operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field. 509 U.S. at 593-94, 113 S.Ct. 2786.

. M.R.E. 702 was amended in 2004 to parallel a 2000 amendment to Fed.R.Evid. 702. Drafters' Analysis app. 22 at A22-52.

. We note that Ms. Falk’s opinion was based on her interaction with individuals who stated that they had been sexually assaulted, although Ms. Falk had no means of determining what percentage of those individuals was being truthful.

. Bolstering, as we have used the term here, "occurs before impeachment, that is when the proponent seeks to enhance the credibility of the witness before the witness is attacked.” United States v. Toro, 37 M.J. 313, 315 (C.M.A.1993). We do not, in this case, need to address whether Ms. Falk’s testimony would have been appropriate if the defense had specifically attacked S.A.’s version of events as improbable victim behavior. See, e.g., Cruz, 981 F.2d at 664 ("Nor do we hold that expert testimony may not be used on some occasions to explain even non-esoteric matters, when the defense seeks to discredit the government’s version of events as improbable criminal behavior.’’).

. We note that defense counsel did not make a specific objection when Ms. Falk's testimony exceeded the parameters issued by the military judge. However, we also note that defense counsel had made repeated blanket objections to Ms. Falk’s testimony right from the outset of this court-martial. Further, we note that the military judge was under a continuing obligation to ensure that the testimony was limited to the parameters he had set out previously. Wheeling Pittsburgh Steel Corp., 254 F.3d at 715.