# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39397 (rem)**

———————————

**UNITED STATES**
*Appellee*

v.

**Jason M. BLACKBURN**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

*On Remand from*

The United States Court of Appeals for the Armed Forces

Decided 30 April 2021

———————————

*Military Judge:* Christopher M. Schumann.

*Approved sentence:* Bad-conduct discharge, confinement for 5 years, and reduction to E-1. Sentence adjudged 2 September 2017 by GCM convened at Keesler Air Force Base, Mississippi.

*For Appellant:* Major M. Dedra Campbell, USAF; Major Meghan R. Glines-Barney, USAF; Brian L. Mizer, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before MINK, LEWIS, and KEY, *Appellate Military Judges*.

Judge KEY delivered the opinion of the court, in which Senior Judge MINK and Senior Judge LEWIS joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

KEY, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual abuse of a child based upon him requesting his 12-year-old stepdaughter send him pictures of herself naked (Charge I) and one specification of indecent recording (Charge II) in violation of Articles 120b and 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920b, 920c.[1,2] The members sentenced Appellant to a bad-conduct discharge, confinement for five years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence but disapproved the adjudged forfeitures and deferred the mandatory forfeiture of pay in the amount of $728.00 until the date of action. The convening authority also waived the mandatory forfeiture of all pay and allowances beginning on the date of action and lasting for six months, until Appellant was released from confinement, or upon the expiration of Appellant's term of service, whichever was sooner.

This case is before our court for a second time. In Appellant's initial appeal, Appellant raised eight issues: (1) whether trial defense counsel was ineffective for failing to file a speedy trial motion pursuant to Rule for Courts-Martial (R.C.M.) 707; (2) whether the military judge erred in failing to perform an *in camera* review of mental health records pursuant to Mil. R. Evid. 513; (3) whether the military judge erred in applying the good faith exception to the exclusionary rule after finding insufficient probable cause for a search authorization; (4) whether the military judge erred in allowing certain expert witness testimony; (5) whether the military judge erred by admitting improper sentencing evidence; (6) whether the convening authority improperly denied Appellant's request to defer his reduction in grade; (7) whether the staff judge

---

[1] All references in this opinion to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2012 ed.). All other references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Mil. R. Evid. are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The military judge granted a defense motion under R.C.M. 917 with respect to one charge and its specification of knowingly enticing a minor to engage in sexually explicit conduct in violation of Article 134, UCMJ, 10 U.S.C. § 934. The military judge inaccurately described the Defense's R.C.M. 917 motion for a finding of not guilty as a "motion to dismiss," and he announced the effect of his ruling as "dismiss[ing]" the specification and charge. The court-martial order and report of result of trial upon which the convening authority acted, however, correctly identify the effect of this ruling as entering a finding of not guilty. Appellant did not assert any issue with respect to this inconsistency at trial and has not raised one on appeal. We have not identified any prejudice to Appellant, and we do not further address this issue.

advocate's recommendation (SJAR) and the addendum to the SJAR failed to address Appellant's deferral request; and (8) whether Appellant's sentence was too severe.[3]

During the original review of this case, our court resolved the first two issues adversely to Appellant but resolved the third issue in Appellant's favor, concluding the military judge erred by not suppressing evidence seized in a search of Appellant's home which was unsupported by probable cause. *United States v. Blackburn*, No. ACM 39397, 2019 CCA LEXIS 336 (A.F. Ct. Crim. App. 22 Aug. 2019) (unpub. op.), *rev'd*, 80 M.J. 205 (C.A.A.F. 2020). Specifically, our court held the military judge had erred in finding the good faith exception to the exclusionary rule applied and admitting the seized evidence in spite of the lack of probable cause. *Id*. at \*51. As a result of our court's ruling, both the finding of guilty as to Charge II and its specification (alleging indecent recording) and the sentence were set aside; the court's opinion did not reach the last four issues raised by Appellant. *Id*. at \*3 n.6, \*54. The finding of guilty to Charge I and its specification (alleging Appellant's request for nude photos) was affirmed. *Id*. at \*54.

The Judge Advocate General of the United States Air Force subsequently certified three issues to the United States Court of Appeals for the Armed Forces (CAAF) for review: (1) whether Appellant had waived a basis for suppression he had not raised at trial; (2) whether our court erred in finding that the good faith exception did not apply to the search at issue; and (3) whether the military judge properly denied the motion to suppress evidence pursuant to Mil. R. Evid. 311(a)(3).[4] *United States v. Blackburn*, 80 M.J. 205, 207 (C.A.A.F. 2020). The CAAF concluded Appellant had not waived the basis for suppression, and that the military judge had not abused his discretion when he ruled the good faith exception operated to permit the admission of the seized evidence.[5] *Id*. at 210, 212. The CAAF affirmed our court's judgment regarding Charge I, reversed and set aside the finding as to Charge II along with the

---

[3] This eighth issue was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] Under Mil. R. Evid. 311(a)(3), unlawfully seized evidence is only deemed inadmissible if "exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system."

[5] As a result of the CAAF's resolution of the first two issues, that court did not reach the third certified issue.

decision to set aside Appellant's sentence, and remanded the case to us for further review under Article 66, UCMJ, 10 U.S.C. § 866. *Id*. at 212–13.

In this opinion, we will complete our analysis of Appellant's assignments of error in light of our superior court's decision. This court's prior opinion resolved the first of these two assignments (ineffective assistance of counsel and review of mental health records) adversely to Appellant, and we will not revisit them here.[6] Based upon the CAAF's determination the good faith exception applied to the search of Appellant's house, we now conclude the search was lawful and evidence seized as a result of that search was properly admitted at trial based upon our superior court's analysis. Having so concluded, we do not reach the question of whether Mil. R. Evid. 311(a)(3) provides alternative grounds to support the admissibility of the evidence. We have completed our review under Article 66, UCMJ, and finding no error prejudicial to the substantial rights of Appellant, we affirm Appellant's finding regarding Charge II and his sentence as approved by the convening authority. 10 U.S.C. § 866.

## I. BACKGROUND

Appellant was convicted of sexually abusing his 12-year-old stepdaughter, ES, by requesting she send him nude pictures of herself and for indecently recording her private area using a camcorder while she was in the bathroom.

Appellant was married and stationed at Keesler Air Force Base, Mississippi. He lived on base with his wife Ms. MB, her daughter ES, and their two biological children. At the time of Appellant's charged offenses, his brother's family was staying at the house. As a result of the living arrangements, Appellant, Ms. MB, and their children used the bathroom in the master bedroom. During this time, Ms. MB was attending evening classes each weeknight, and ES testified Appellant would routinely come into the bathroom while she was taking a shower, but only at times when her mother was out of the house at class.

On the night of 20 April 2016, ES was in the bathroom preparing to take a shower. After she had removed only her pants, she saw a camcorder on the bathroom floor—partially covered by one of Appellant's shirts—with a red light on. She went over and picked the camcorder up, saw that it was recording, and found two videos on it. She could only view one of the videos, and that video showed her in the bathroom without her pants on. Upset, ES walked out of the bathroom and confronted Appellant who claimed "he was trying to make it look

---

[6] In our earlier opinion, we also considered whether Appellant was entitled to relief for post-trial delay—an issue which Appellant did not raise. We concluded he was not, and we will not disturb that conclusion here.

like a trick and that he was just kidding." ES wanted to call her biological father, Mr. JS, but Appellant took her cellular phone from her. Approximately five minutes later, Appellant returned ES's phone to her. She called her father, but the call went to his voicemail, so she left a message asking him to call her back.

At the time, ES's father and her stepmother Ms. LS were in the process of moving from Texas to Arkansas. Mr. JS testified that he and Ms. LS were having dinner the evening of 20 April 2016 at a restaurant in Dallas, Texas, when he saw that he had missed calls from ES and had a voicemail from her. He said he listened to the voicemail and described ES as "barely able to talk. It sounded like she was having a hard time breathing, just telling me to call her back as soon as I can." Shortly thereafter, Mr. JS called ES and he testified that she sounded scared, initially asking to come live with him. Mr. JS also said ES then told him about finding the camcorder in the bathroom. Mr. JS informed his wife what ES had said, and she called the police in Biloxi (Mississippi) while Mr. JS and Ms. LS started driving to Keesler Air Force Base. Along the way, Ms. LS attempted to reach ES's mother, Ms. MB, but received no response to either calls or text messages. Ms. LS also called the security forces at Keesler Air Force Base.

Later that night, pursuant to Mr. JS's consent, ES was taken to the local Air Force Office of Special Investigations (AFOSI) detachment and interviewed in the early morning hours of 21 April 2016. In addition to describing the events surrounding her finding the hidden camera, ES explained it was not the first time Appellant had a camcorder in the bathroom. She said that a few weeks earlier, Appellant came into the bathroom while she was in the shower and held the camera over the shower curtain. On that occasion, she confronted Appellant who told her it was not recording and that it was just a joke. ES also told the AFOSI agents that one night when Appellant was tucking her into bed, he talked about his upcoming deployment and asked her to send him photographs of her naked because he was going to miss her. ES, however, never sent Appellant any such pictures.

After ES's interview, AFOSI agents sought and obtained authorization to search Appellant's house for cameras as well as computers, electronic storage media, and other electronic devices. Forensic analysis of hard drives found in a desktop computer seized from the house revealed nine video files consisting of recordings taken in Appellant's bathroom from two different vantage points—from the floor looking upwards and from the vanity looking towards the shower. Several of the video files show ES nude in the bathroom as she both prepares to shower and emerges from the shower to dry off. Some of the videos also show Appellant placing the camera as well as adjusting both its

direction of focus and the materials he was using to conceal the camera's presence. The analysis, conducted by the Department of Defense Computer Forensics Laboratory (DCFL), further determined six of the video files were imported into the desktop computer via an external media reader and were being compiled with the computer's video editing software into a single video project named "My Precious." Data found on the computer indicated the video software had crashed at some point and triggered an "autosave" function which copied those six video files into a temporary folder. The actual "My Precious" project file was never found, but three other video files of ES in the bathroom were discovered in unallocated space on one of the hard drives—evidence these files had once been saved on the hard drive but had been deleted by a user of the computer.

At trial, ES's stepmother, Ms. LS, testified she had noticed Appellant previously asking ES via text message to send him pictures of herself when ES was visiting the couple as part of Mr. JS's custody-sharing arrangement with Ms. MB. Ms. LS found the requests to be inappropriate and she took photographs of the messages, and those messages, which predated the 20 April 2016 videotaping incident by approximately three years, were admitted in evidence at Appellant's court-martial.

## II. DISCUSSION

### A. Admission of Expert Testimony

Appellant argues on appeal that the military judge erred by finding Petty Officer First Class (PO1) AG,[7] a DCFL analyst, qualified as an expert in the field of computer and digital forensics over defense objection. We disagree.

#### 1. Additional Background

PO1 AG was a computer forensics examiner assigned to DCFL during the investigation of Appellant's case. She explained that once copies were made of media storage devices seized from Appellant's house, she reviewed six videos found on Appellant's computer of ES in various stages of undress in the bathroom. Pursuant to a request from the lead investigator on the case, PO1 AG conducted further analysis of those files. She described this "further analysis" as an effort to determine "how did [the files] get there, possibly why were they [t]here, what produced it, what could have produced it, what user produced [it], and things of that nature."

---

[7] According to her curriculum vitae, PO1 AG's rank was CTN1 (Cryptologic Technician-Networks Petty Officer First Class) (E-6).

PO1 AG produced a report of her analysis, and that report was admitted into evidence. Her testimony largely walked through her report as she explained where the video files were found on Appellant's hard drive, what format they were in, and what information she gleaned from "link files"—small files created when a user first opens another file. She testified she reviewed registry files on the computer which showed both that a media card reader had been attached to the computer, and that it had been used to access data on secure digital (SD) cards which were compatible with Appellant's video camera. She explained she found references to the video software crashing as well as deleted videos which appeared to be similar to the video files preserved when the software executed its "autosave" function. She said the computer's sole username was "Landarion," which Ms. MB testified was Appellant's username.[8]

PO1 AG pointed to the filenames of the six original video files as suggesting the date they were created, but she could not definitively conclude the filenames accurately depicted those dates.[9] Most of the files appeared to have been opened on the computer the day after they had been created by the video camera. All six of the files found on Appellant's computer in the temporary folder were created within a 40-minute period on 15 April 2016, suggesting that this was when Appellant was assembling the files into the "My Precious" project and when the software crashed. PO1 AG could not definitively say that the video camera seized from Appellant's house was the specific camera which made the video files, but she testified the camera had the capability to save videos in the same file format as those found on Appellant's computer.

Early in PO1 AG's testimony, the Government asked the military judge to recognize her as an expert in the field of computer and digital forensics. The Defense objected, stating, "We believe that she would testify to the analysis that she did in this case as an examiner; however, she lacks the sufficient education, experience, and testimonial qualifications to be qualified as an expert in this court." At the time of Appellant's trial, PO1 AG had been assigned to DCFL for about a year, and she had been a network analyst prior to that, accumulating more than six years of experience working with computers in the military. She had completed three 40-hour courses related to computer forensics, obtained several professional certifications, passed an annual proficiency test, and completed forensic examinations for eight cases (including Appellant's). PO1 AG, however, did not possess any professional degrees in computer

[8] "Landarion" was also associated with one of Appellant's publicly visible social media accounts.

[9] For example, one filename was 20160323, suggesting the video file was originally created on 23 March 2016.

forensic analysis, nor had she taught, lectured, or published in that field. While she had several certifications, she had not received a certification on the software she used to extract information from Appellant's hard drive. Moreover, PO1 AG was testifying for the first time at Appellant's trial, so she had never been recognized as an expert before by a judge.

In arguing the Defense's objection to the military judge, trial defense counsel said PO1 AG could "certainly testify to what she went through, the procedures that she followed, and how she analyzed this case and the computer in front of her. However, that does not make her an expert in computer forensics." The military judge overruled the Defense's objection, finding that PO1 AG "has specialized knowledge that can assist the trier of fact in understanding the evidence and sufficiently meets the qualifications to be recognized as an expert in the field of computer and digital forensics." Other than objecting to the admission of her written report—an objection which was also later overruled— the Defense did not object during PO1 AG's direct testimony.

### 2. Law

We review a military judge's decision to permit a witness to testify as an expert for abuse of discretion. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014) (citation omitted). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008).

Mil. R. Evid. 702 permits expert testimony when the witness "is qualified as an expert by knowledge, skill, experience, training, or education" such that their testimony can "assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Mustafa*, 22 M.J. 165, 167 (C.M.A. 1986). This threshold "requires only that the proffered witness have some specialized knowledge as a result of experience or education." *Id.* at 167–68. We have held that by this standard, a person may qualify as an expert witness even if he or she is not "a star in the field." *United States v. Anderson*, 36 M.J. 963, 978 (A.F.C.M.R. 1993) (citations omitted), *aff'd*, 39 M.J. 431 (C.M.A. 1994). Under Mil. R. Evid. 702, an expert witness "may testify in the form of an opinion or otherwise," so long as the testimony is helpful and based upon adequate facts, reliable principles, and reliable application of the principles to the facts.

### 3. Analysis

Appellant's argument at trial and now on appeal is focused not on the substance of PO1 AG's testimony, but rather on the fact that the military judge recognized her as an expert. Indeed, trial defense counsel explicitly told the

military judge that the Defense viewed PO1 AG's testimony as properly covering her analysis of the digital evidence seized from Appellant's house. Trial defense counsel did not object to anything PO1 AG said during her direct examination, and on appeal Appellant does not identify any portion of her testimony purportedly beyond her ken, regardless of her status as an expert.

By the time she testified at Appellant's court-martial, PO1 AG had taken courses related to computer forensics, obtained professional certifications, passed a proficiency test, and conducted forensic examinations in eight other cases. Thus, she had "some specialized knowledge as a result of experience or education" regarding the forensic analysis of computers and their components. *Mustafa*, 22 M.J. 167–68. Her testimony largely covered issues surrounding the videos found on Appellant's computer which were a substantial part of the Government's case against Appellant. Her explanation of both how she found those files and what the computer's user had done with them addressed such critical prosecutorial aspects as Appellant's intent and the scope of his conduct. In short, PO1 AG's testimony was helpful in assisting the members in understanding the evidence itself, and we see nothing erroneous in the military judge's decision to recognize her as an expert.

We find it also worth noting that the vast majority of PO1 AG's testimony was her discussion of the steps she had taken in analyzing Appellant's digital media and what she had found. She only rarely testified in the form of opinion, and when she did, she made somewhat minor points. For example, PO1 AG offered her opinion that "[i]t seem[ed] like a compilation video was being made with all six videos being in the same project." At another point, she said she was "confident" about the "probable dates" the videos were recorded based upon the filenames which had dates embedded in them. We see no indication PO1 AG offered any opinions that either exceeded her observations made during her analysis or were likely to mislead the members. Moreover, while the video files themselves were significant to the Government's case, Appellant could hardly mount a defense claiming he was not responsible for their creation given that Appellant's face clearly appears in several of the videos as he was setting up the camera. This direct evidence of Appellant's involvement in creating the videos served to render the military judge's decision to recognize PO1 AG as an expert witness relatively inconsequential to Appellant's trial. Thus, even if the military judge erred in recognizing PO1 AG as an expert, Appellant suffered no prejudice. Finding no error, we decline to grant Appellant any relief with respect to the military judge's ruling.

**B. Admission of Evidence Regarding Transitional Compensation**

Appellant asserts the military judge erred by permitting the Government to introduce rebuttal evidence in sentencing of a program which provides monetary relief to particular victims of domestic abuse. Appellant, however, waived this issue at trial.

**1. Additional Background**

During the Defense's sentencing case, Appellant's mother testified that Appellant took care of his biological children financially, emotionally, and mentally. Appellant also told the members—via both spoken and written unsworn statements—that he was worried about the future of his children, and his main concern was the health and welfare of his family. Character letters submitted by friends and family included statements that Appellant's children "needed his monetary support" and for "him to provide for them."

Once the Defense rested during sentencing proceedings, trial counsel offered Department of Defense Instruction (DoDI) 1342.24, *Transitional Compensation for Abused Dependents* (23 May 1995, incorporating Change 1, 16 Jan. 1997), as a prosecution exhibit in rebuttal. Trial counsel did not explain what the DoDI was intended to rebut. The military judge asked if the Defense had any objections, and trial defense counsel answered, "No, Your Honor." The document was then admitted as a prosecution exhibit.

In essence, the transitional compensation program provides financial assistance to dependents abused by the servicemember who supports them and is later convicted at a court-martial and separated from the service as a result. *See United States v. Lundy*, 63 M.J. 299, 302 (C.A.A.F. 2006); DoDI 1342.24. The program only applies to situations involving an offense of abuse "against the person" of a spouse or dependent child (to include stepchildren), but the DoDI does not explain what specific offenses qualify or who makes a determination in borderline cases. DoDI 1342.24, ¶ 3.1. The program is also only applicable in cases where the servicemember is punitively discharged, discharged administratively, or required to forfeit all pay and allowances. *Id*. at ¶ 2.2. Payments are authorized for up to three years, starting on the date of convening authority action, but if the servicemember's term of service expires sooner, then the payments are only authorized through that term or 12 months, whichever is longer. DoDI 1342.24, ¶ 6.2.1.1. Payments are available upon application, and they are directed to the servicemember's spouse, but payments are forfeited if the spouse remarries. *Id*. at ¶¶ 6.6, 6.3.1. The instruction explains the payments are tied to dependency and indemnity compensation rates, but the instruction itself does not identify what those rates are. *Id*. at ¶ 6.2.2.1. Because Appellant's term of service expired within one year of the convening

authority's action, the maximum duration of any payments here was 12 months.

During his sentencing argument, trial counsel used DoDI 1342.24 to support his recommendation that Appellant be sentenced to "at least 12 years." Trial counsel argued:

> Members, I know he has other children, he has those two young kids that we've talked about a few times . . . . And the maximum punishment the judge just told you is 20 years confinement. The fact that he does have those kids weighs heavily on the decision to recommend just 12 years, nowhere near the max . . . . We think that it should be at least 12 years, and we start at 12 because of that reason[,] because of these kids.

> I want to bring up two points about those children. The first is [DoDI 1342.24]. Please read through this and look at exactly what it says and what it means. There's a Department of Defense program designed specifically to make sure that there is compensation available for up to three years for those kids. The DoD and the Air Force is going to take care of them financially, under certain requirements, the details are in there, but make no mistake, they're not going to be completely destitute if you punish him the way he deserves.

Trial counsel later returned to the DoDI when arguing Appellant should be sentenced to forfeit all of his pay and allowances, telling the members: "I reference [DoDI 1342.24] again, for transitional compensation. His family has other means of income." The Defense did not object to these portions of trial counsel's argument.

**2. Law**

A court-martial is "to concern [itself] with the appropriateness of a particular sentence for an accused and his offense, without regard to the collateral administrative effects of the penalty under consideration." *United States v. Griffin*, 25 M.J. 423, 424 (C.M.A. 1988) (citation omitted). Collateral consequences are typically not germane, and ignoring this proposition "would mean that [military judges] would be required to deliver an unending catalogue of administrative information to court members. . . . The waters of the military sentencing process should [not] be so muddied." *United States v. McNutt*, 62 M.J. 16, 19 (C.A.A.F. 2005) (alterations in original) (quoting *United States v. Quesinberry*, 31 C.M.R. 195, 198 (C.M.A. 1962)).

In order to preserve a claim of error with respect to the admission of evidence, a party must both timely object to the evidence and state the specific ground for the objection. Mil. R. Evid. 103(a)(1). When an appellant fails to

make a timely objection to the admission of evidence at trial, that error is forfeited in the absence of plain error. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)) (additional citations omitted). However, under the ordinary rules of waiver, when an appellant affirmatively states he has no objection to the admission of evidence, the issue is waived and his right to complain about its admission on appeal is extinguished. *United States v. Ahern*, 76 M.J. 194, 198 (C.A.A.F. 2017) (citing *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009)).

Even in the face of a valid waiver of an alleged error, we have the authority to decide whether to leave that waiver intact or to pierce the waiver and consider the underlying issue. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *United States v. Chin*, 75 M.J. 220, 222–23 (C.A.A.F. 2016) (addressing this court's ability to correct the error despite waiver).

### 3. Analysis

Appellant argues the DoDI was improper rebuttal evidence because it did not relate to anything in Appellant's sentencing case. He further argues the instruction was irrelevant insofar as transitional compensation was only available if the members sentenced Appellant to a punitive discharge, which permitted trial counsel to implicitly suggest the members should so sentence Appellant in order to provide financial assistance to his family. As a remedy, Appellant asks that we grant him "meaningful sentence relief" or remand his case for "a new pre-sentencing proceeding." The Government responds that Appellant opened the door to such rebuttal by implying his family would suffer a loss of income and that even if admission of the DoDI was error, it was not plain error.

We do not reach Appellant's objection to the introduction of this collateral evidence in his court-martial, because Appellant affirmatively waived this issue at trial. Trial defense counsel made the conscious decision not to object to the admission of the DoDI, and there were no defense objections to trial counsel's references to the instruction in his argument. Although the lack of objection during argument is typically considered to forfeit an appellate issue, trial defense counsel's earlier declaration that the Defense had no objection to the DoDI served to waive purported error surrounding the admission of the DoDI, and the fact trial defense counsel did not later object to trial counsel's argument bolsters our assessment that trial defense counsel intentionally and purposely waived the matter for appeal.

In determining whether to leave Appellant's waiver intact, we considered the improbability that the introduction of the DoDI and the related arguments had any impact on the sentence Appellant was adjudged. According to the

DoDI, Appellant's family was only eligible to receive transitional compensation for one year—significantly less than the term of five years of confinement the members determined was an appropriate sentence. We also see no indication the members sentenced Appellant to a punitive discharge in order to give his family access to transitional compensation for two reasons: trial counsel never argued such a sentence was warranted to achieve that purpose, and the members' sentence including forfeiture of all pay and allowances served to trigger eligibility for the program even independently of a punitive discharge. Based upon the facts presented here, we will leave Appellant's waiver intact.

## C. Appellant's Requests for Sentence Relief

Appellant raises three issues related to post-trial requests for relief from those portions of his sentence pertaining to monetary forfeitures and reduction in grade. He first asserts the convening authority erred by summarily denying his request that his adjudged reduction in grade be deferred. Second, he asserts the SJAR did not address: (1) the grade-deferral request, (2) his request that the convening authority defer his mandatory forfeitures, or (3) his request for waiver of his mandatory forfeitures. His third assertion is that the addendum to the SJAR failed to correct Appellant's clemency submission which allegedly misstated the scope of the convening authority's power. As a proposed remedy for the first issue, Appellant requests this court "reduce his sentence as [the court] deems appropriate." For the second and third issues, Appellant asks us to order new post-trial processing. Because these three issues are interrelated, we will consider them together.

### 1. Additional Background

Appellant's court-martial concluded on 2 September 2017 after he was sentenced to be confined for five years in addition to being reduced in grade and discharged with a bad-conduct discharge. Three days later, trial defense counsel submitted a request to the convening authority asking him to: (1) defer Appellant's reduction in grade until action; (2) defer his mandatory forfeitures until action; and (3) waive the mandatory forfeitures "for the remainder of [Appellant's] period of confinement for the benefit of his son and daughter."[10] Attached to this request was an email from Ms. MB who explained that she and Appellant had divorced, and Appellant was paying child support in the amount of $728.00 per month for the benefit of the two children he and Ms. MB had together.

On 13 September 2017, the convening authority signed a memorandum addressed to Appellant. The memorandum reads, in its entirety,

---

[10] The request later notes the payments would "indirectly benefit" ES, due to Ms. MB maintaining joint custody of her.

1. The request for deferment of adjudged forfeitures and reduction in grade is denied.

2. The adjudged forfeitures are disapproved.

3. Pursuant to Article 57, Section (a)(2) and 58b Section (a)(1), UCMJ, $728.00 of the mandatory forfeitures will be deferred from 16 September 2017 until the date of action.

4. Pursuant to Article 58b, UCMJ, I direct that the mandatory (automatic) forfeitures of all pay and allowances be waived for a period of six months, or for the period of confinement, whichever is sooner, with waiver commencing on the date of action, so long as the Accused is otherwise entitled to pay. The waived forfeitures will be paid to Ms. [MB] for her benefit and for the care of their dependent children.

In the left margin of the memorandum next to the first line of paragraph 4, there is a mark consisting of a few diagonal lines. Nothing in the memorandum explains who made this mark or what it represents. On appeal, Appellant argues the memorandum's four paragraphs each represent separate options, and that the mark "appears" to be the convening authority's initials representing the convening authority's intent to select the fourth option. The Government, on the other hand, argues the convening authority intended to take the actions outlined in all four of the paragraphs, not just the last one. The Government does not take a position as to the significance of the mark on the memorandum.

About three months after the court-martial, on 8 December 2017, the staff judge advocate signed his recommendation which did not mention Appellant's deferment and waiver requests. He recommended the convening authority "approve the sentence as adjudged." On 23 December 2017, Appellant submitted a request for clemency consisting of a memorandum from himself and a memorandum from his trial defense counsel, along with character letters and other supporting documents. Appellant's memorandum does not mention the deferment and waiver requests and does not request the convening authority take any particular action respecting his sentence. Trial defense counsel's memorandum, in relevant part, notes Ms. MB had "not received the financial assistance [the convening authority] previously ordered." Trial defense counsel added, "[Appellant] now brings this to your attention and asks you to ensure that your previous order is obeyed and Ms. [MB] receives the support she requires." As evidence of this contention, Appellant submitted a 22 December 2017 email from Ms. MB which reads, in part: "I understand I was supposed to receive portions of [Appellant's] pay to help support our children. As of today,

I have not received any of these payments with the exception of a $280.00 paper check that was from the military, but did not say what [it] was directed toward."

Trial defense counsel's memorandum also asked the convening authority to approve only three of the five years of confinement Appellant was sentenced to. Seemingly at odds with this request, the very next paragraph of the memorandum explains, "a convening authority may not disapprove, commute, or suspend in whole or in part an adjudged sentence of confinement for more than six months[,]" as Appellant's did. The memorandum identifies a number of legal issues from Appellant's trial and goes on to explain Appellant was willing to assist in an unrelated criminal investigation in order to obtain a recommendation from trial counsel for a lower sentence as consideration for his assistance. There is no evidence in the record trial counsel ever made such a recommendation.

The addendum to the SJAR, dated 27 December 2017, mentions neither Appellant's deferment and waiver requests nor the convening authority's 13 September 2017 purported action on those requests. The addendum briefly summarizes the legal errors raised by trial defense counsel and notes Appellant had asked for sentence relief based upon assistance with the other investigation. The acting staff judge advocate who signed the memorandum wrote, "I carefully considered these allegations of error and find them to be without merit" and that "[t]he earlier recommendation set forth in the [SJAR] remains unchanged." That same day, the convening authority took action on Appellant's sentence, approving the sentence as adjudged with the exception of the adjudged forfeitures, which he disapproved. The action further reads:

> Pursuant to Articles 57, Section (a)(2), and 58b, Section (a)(1), UCMJ, $728.00 of the mandatory forfeitures were deferred from 16 September 2017 until the date of action. Pursuant to Article 58b, Section (b), UCMJ, all of the mandatory forfeitures are waived for a period of six months, release from confinement or expiration of term of service, whichever is sooner, with waiver commencing on the date of this action. The total pay and allowances is directed to be paid to [Ms. MB], spouse of the accused, for the benefit of herself and their dependent children.

### 2. Law

Appellant was sentenced to forfeit all pay and allowances, so his sentence to those adjudged forfeitures was to go into effect either 14 days after his court-martial or the date of the convening authority's action on his sentence, whichever occurred first. Article 57(a)(1), UCMJ, 10 U.S.C. § 857(a)(1). By virtue of being sentenced to both confinement and a punitive discharge by a general

court-martial, Appellant was also required to forfeit his pay and allowances during his period of confinement by operation of law. Article 58b(a)(1), UCMJ, 10 U.S.C. § 858b(a)(1). These "automatic" or "mandatory" forfeitures likewise commence on the earlier of the date of convening authority action or 14 days after a sentence is adjudged. Articles 58b(a)(1) and 57(a)(1), UCMJ. Appellant's adjudged reduction in grade similarly went into effect 14 days after his sentence was adjudged by operation of Article 57, UCMJ. Before the convening authority could take action on Appellant's case, certain procedural requirements must have first been met, such as the completion of a written SJAR and Appellant being afforded the right to submit matters in clemency responding to the recommendation. Articles 60(c)(2)(A) and (e), UCMJ, 10 U.S.C. § 860(c)(2)(A), (e).

Under Article 57(a)(2), UCMJ, the starting date of adjudged forfeitures may be deferred, or postponed, in the discretion of the convening authority, until approval of the sentence. 10 U.S.C. § 857(a)(2). Under Article 58b(a)(1), UCMJ, the convening authority may also defer the start date of mandatory forfeitures. *See* Article 57(a)(2), UCMJ; R.C.M. 1101(c). A convening authority may further defer an adjudged reduction in grade until the sentence is approved. Article 57(a)(2), UCMJ.[11] If a deferment of mandatory forfeitures is granted, and the accused is otherwise entitled to pay, the accused will continue to receive his pay during the deferral period. *See United States v. Key*, 55 M.J. 537, 542 (A.F. Ct. Crim. App. 2001), *aff'd*, 57 M.J. 246 (C.A.A.F. 2002).

Separate and apart from deferring the start date of forfeitures, a convening authority has the power to waive any or all of the mandatory forfeitures for a period of six months or less. Article 58b(b), UCMJ, 10 U.S.C. § 858b(b); R.C.M. 1101(d). These waived forfeitures are paid to the dependents of the confined member. *Id.* Importantly, when a sentence to adjudged forfeitures is in effect, amounts forfeited as a result of that sentence are unavailable to be waived for the dependents' benefit, so convening authorities will typically defer, suspend, or disapprove adjudged forfeitures in order to make pay available for the waiver process under Article 58b, UCMJ. *See United States v. Emminizer*, 56 M.J. 441, 445 (C.A.A.F. 2002). A convening authority may act on requests for

---

[11] Under Article 58a, UCMJ, 10 U.S.C. § 858a, an enlisted member with a sentence to a punitive discharge or confinement is automatically reduced to the grade of E-1 upon the convening authority's action unless the relevant service secretary issues regulations to the contrary. Such regulations in the Air Force have been promulgated, and as a result, this provision does not apply to Air Force members. *See* Air Force Instruction (AFI) 51–201, *Administration of Military Justice*, ¶ 9.26.3 (6 Jun. 2013, as amended by AFGM 2016-01, 3 Aug. 2016)).

waiver of mandatory forfeitures while taking action on the court-martial sentence, or at any earlier point in time. *See, e.g.*, *United States v. Robinson*, 56 M.J. 541, 548 (A.F. Ct. Crim. App. 2001), *aff'd*, 58 M.J. 429 (C.A.A.F. 2003).[12] A convening authority's power to approve or disapprove adjudged forfeitures, however, is tied to the convening authority's formal action on the sentence under Article 60, UCMJ. *See Emminizer*, 56 M.J. at 442.

Although related, deferment and waiver of forfeitures are distinct concepts with separate requirements and different standards of review. A convening authority's decision on a deferment request must be in writing, served on the member making the request, and attached to the record of trial. R.C.M. 1101(c)(3), 1103(b)(3)(D). If the request is denied, the convening authority must include the basis for that denial in the written decision. *See United States v. Sloan*, 35 M.J. 4, 6–7 (C.M.A. 1992), *overruled on other grounds*, *United States v. Dinger*, 77 M.J. 447 (C.A.A.F. 2018); *see also* R.C.M. 1101(c)(3), Discussion. In deciding whether or not to grant a deferment, the convening authority may obtain a written legal review from his or her staff judge advocate, but there is no requirement the convening authority do so. *Key*, 55 M.J. at 542–43.

We review a convening authority's decision on a deferment request for an abuse of discretion. *Sloan*, 35 M.J. at 6 (citing R.C.M. 1101(c)(3)). In reviewing challenges to deferment denials, we have not required convening authorities to provide in-depth analyses as to their rationale; instead, we have required them to simply identify the reasons for the denial. *See, e.g.*, *United States v. Bell*, No. ACM 39447, 2019 CCA LEXIS 293, at *5 (A.F. Ct. Crim. App. 9 Jul. 2019) (unpub. op.). We have found error with respect to deferment denials when the convening authority advances no reason for the denial at all. *See, e.g.*, *United States v. Paulett*, No. ACM 39268, 2018 CCA LEXIS 444, at *18 (A.F. Ct. Crim. App. 14 Sep. 2018) (unpub. op.). Even when a convening authority commits error by failing to set out reasons for denying a deferment request, we have generally not granted relief in the absence of "credible evidence that a convening authority denied a request to defer punishment for an unlawful or improper reason . . . ." *United States v. Eppes*, No. ACM 38881, 2017 CCA LEXIS 152, at *43 (A.F. Ct. Crim. App. 21 Feb. 2017) (unpub. op.) (citing *United States v. Zimmer*, 56 M.J. 869, 874 (A. Ct. Crim. App. 2002)), *aff'd*, 77 M.J. 339 (C.A.A.F. 2018); *but see United States v. Frantz*, No. ACM 39657, 2020 CCA LEXIS 404, at *56–57, n.17 (A.F. Ct. Crim. App. 10 Nov. 2020) (unpub.

---

[12] At the time of Appellant's waiver request and the convening authority's action, AFI 51-201, ¶ 9.28.6, provided that the convening authority could waive mandatory forfeitures before taking action in a case.

op.) (granting relief where convening authority did not explain denial of deferment request in face of staff judge advocate's recommendation the request be granted).

While a convening authority's power to defer and waive forfeitures are both based in statute, the waiver power derives from convening authority action under Article 60, UCMJ, and waiver therefore is an act of clemency. *United States v. Spears*, 48 M.J. 768, 772–73 (A.F. Ct. Crim. App. 1998), *overruled in part on other grounds*, *United States v. Owen*, 50 M.J. 629 (A.F. Ct. Crim. App. 1998). As a result, the procedural due process requirements of the clemency process apply to waiver requests. *Id.* Unlike a decision on a deferment request, the convening authority's decision on a waiver request need not be in writing. *United States v. Edwards*, 77 M.J. 668, 670 (A.F. Ct. Crim. App. 2018). When a waiver request is submitted as part of a clemency request, there is no requirement the request be addressed in either the SJAR or the SJAR addendum, so long as there is evidence the convening authority considered the waiver request. *Id.* Because a convening authority's exercise of discretion to waive or deny waiver of mandatory forfeitures is a matter of clemency, it is not subject to judicial review. *Id.* (citations omitted).

Under the version of Article 60, UCMJ, applicable to Appellant's sentence, the convening authority had no authority to "disapprove, commute, or suspend in whole or in part an adjudged sentence of confinement for more than six months" except in certain circumstances, one of which is "[u]pon the recommendation of the trial counsel, in recognition of the substantial assistance by the accused in the investigation or prosecution of another person." Article 60(c)(4), UCMJ, 10 U.S.C. § 860(c)(4).

We review questions regarding the proper completion of post-trial processing de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citation omitted). In general, when a trial defense counsel's clemency submission misstates the law, "the staff judge advocate is duty-bound to correct it in the [a]ddendum to ensure that the convening authority exercises that authority in conformity with the law." *See United States v. Martino*, No. ACM S32511, 2019 CCA LEXIS 520, at \*17 (A.F. Ct. Crim. App. 12 Jul. 2019) (unpub. op.) (alteration in original) (citation omitted), *rev. denied*, 80 M.J. 190 (C.A.A.F. 2020). When a plain error occurs during post-trial processing, an appellant will not be granted relief without first demonstrating at least "some colorable showing of possible prejudice." *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000) (citation omitted).

### 3. Analysis

#### *a. Request for Sentence Deferment and Forfeiture Waiver*

Appellant's request for deferment and waiver of portions of his sentence and the convening authority's response are not models to be emulated. Appellant's request is ambiguous, while the convening authority's response both fails to meet legal requirements and purports to take unauthorized action, which we discuss in greater detail below.

Appellant asked the convening authority to "defer his reduction in [grade] until action [and] defer his [mandatory] forfeitures until action," explaining that both would take effect 14 days after his court-martial unless the convening authority intervened. Appellant, however, made no reference to his *adjudged* forfeitures. Had Appellant's request been granted in full, he would have remained at the grade of staff sergeant (E-5) until the convening authority took action nearly four months later. His adjudged forfeitures, however, would have commenced 14 days after the date he was sentenced, and he would have received no pay from that point forward, even if the mandatory forfeitures were deferred. In order to continue receiving his pay at the E-5 rate until the convening authority took action, Appellant needed to secure the convening authority's agreement to defer his adjudged forfeitures in addition to his mandatory forfeitures and his reduction in grade. Appellant, however, did not make any request related to his adjudged forfeitures.

Appellant's request became even less clear when he asked the convening authority to "waive the [mandatory] forfeitures for the remainder of [Appellant's] period of confinement." Because a convening authority is only permitted to waive mandatory forfeitures for six months, the convening authority here had no ability to waive those forfeitures for the duration of Appellant's five-year sentence to confinement. Appellant also did not explain whether he was requesting the waiver to begin when the convening authority took action or at some other point in time. If he intended this waiver to begin upon action, Appellant was facing the problem that his adjudged forfeitures and reduction in grade would become effective on that date—assuming the convening authority elected to approve both of those elements of his sentence—even if the convening authority had deferred those punishments through action as Appellant requested. In other words, once those adjudged forfeitures went into effect, Appellant would have no mandatory forfeitures left to waive, and any granted waiver would have yielded no benefit to his dependents.

Regarding the convening authority's response to Appellant's request, we—as an initial matter—decline Appellant's invitation to interpret the mark on the memorandum as an indication of the convening authority selecting only one paragraph of the memorandum to be applied. The four paragraphs appear

to be complementary and not a list of options, and Appellant has not demonstrated the mark on the memorandum was intended to convey any message at all, much less an affirmative election by the convening authority to render one and only one paragraph effective.

The first paragraph of the convening authority's memorandum denies Appellant's request to defer his adjudged reduction in grade. The paragraph also states Appellant's request to defer his *adjudged* forfeitures is also denied—yet, Appellant never asked that these forfeitures be deferred, as he only discussed *mandatory* forfeitures in his request. The next paragraph purports to "disapprove" Appellant's adjudged forfeitures, which would seemingly render any issue regarding adjudged forfeitures moot, except for the fact the convening authority had no ability to disapprove any part of Appellant's sentence under Article 60, UCMJ, at this stage in the proceedings. Before the convening authority could take action on Appellant's sentence, the convening authority was required to obtain a written recommendation from his staff judge advocate as well as offer Appellant the opportunity to respond to that recommendation—none of which had occurred by the date the convening authority executed this memorandum. The convening authority's purported disapproval of the adjudged forfeitures at this stage was of no legal effect and amounted, at most, to a statement of what the convening authority proposed to do when he ultimately did take action.

The third paragraph of the convening authority's memorandum purports to defer $728.00 of the mandatory forfeitures from 16 September 2017 until the date of action.[13] Yet, by virtue of not deferring Appellant's adjudged forfeitures, those adjudged total forfeitures would have gone into effect on 16 September 2017—14 days after Appellant's court-martial, the same day as his mandatory forfeitures commenced—leaving no forfeitures available to defer. As such, this attempted deferment was unlikely to result in Appellant receiving the $728.00 prior to action.

In the fourth paragraph, the convening authority prospectively directs mandatory forfeitures be waived for six months beginning at the date of action. This direction was captured in the convening authority's action, executed more than three months later, which disapproved all of Appellant's adjudged forfeitures. The disapproval of these forfeitures in the action operated to make those forfeitures available for waiver under Article 58b, UCMJ. In addition, the disapproval should have retroactively made the deferred $728.00 in mandatory

---

[13] $728.00 is the amount of child support Appellant would pay each month; the rationale behind the convening authority's decision to only waive enough of the forfeitures to amount to a single payment of $728.00 during the four-month period between trial and action is unexplained in the record.

forfeitures available to Appellant. Because Appellant never asked that his reduction in grade be suspended beyond the convening authority's action, forfeitures waived on behalf of his dependents would have been at the E-1 rate. Moreover, because no waiver of forfeitures was approved prior to action, none of Appellant's pay would have been waived for Ms. MB's benefit before then, which could explain the fact she had not received the payments she expected at the time Appellant submitted his clemency request.

Once the convening authority took action and disapproved the adjudged forfeitures, Appellant was only facing mandatory forfeitures which the convening authority could (and did) waive for a period of six months for the benefit of Appellant's family. What the ultimate result of the foregoing should have been—and Appellant has not indicated otherwise—is that Ms. MB received six months of Appellant's pay and allowances beginning at action based upon Appellant's E-1 grade. What Appellant likely did not receive was pay and allowances during the period between 16 September 2017 (14 days after his court-martial) and 27 December 2017 (date of convening authority's action), much less those pay and allowances at the E-5 rate.

Unquestionably, the convening authority erred by failing to offer a rationale for denying Appellant's deferment request. His memorandum contains no explanation at all for his decision, making it all but impossible for us to meaningfully determine whether he abused his discretion in taking the action he did. Despite this failure, we do not grant relief without credible evidence that he denied the request for an unlawful or improper reason. Appellant has identified no such evidence, instead arguing there was "simply no reason" for the denial. This is insufficient here. Considering Appellant's request, by its terms, would not have stopped Appellant's adjudged forfeitures from going into effect prior to action, the convening authority's denial had no perceptible impact on Appellant's situation.[14] Thus, Appellant suffered no prejudice as a result of the convening authority's error, and relief is unwarranted.

### b. Request for Sentence Reduction

In his clemency submission, Appellant's trial defense counsel asked the convening authority to reduce Appellant's sentence to confinement from five years to three years. Because Appellant had been sentenced to more than six months of confinement, the convening authority had no ability to modify this portion of Appellant's sentence without a recommendation from trial counsel,

---

[14] We have recently held that convening authorities may not defer adjudged sentences without first being asked to do so by an accused under both Article 57(a)(2), UCMJ, and R.C.M. 1101(c)(2), the same versions of which are applicable in Appellant's case. *United States v. Ramirez*, No. ACM S32538, 2020 CCA LEXIS 20, *14 (A.F. Ct. Crim. App. 24 Jan. 2020) (unpub. op.).

a proposition trial defense counsel correctly explained in the next paragraph of the submission. Trial defense counsel's argument seemed to be that Appellant was providing assistance to local prosecutors in an unrelated investigation and that the convening authority should grant relief to Appellant even though trial counsel had not provided a recommendation that Appellant's sentence be reduced. Without this prerequisite recommendation, however, the convening authority in Appellant's case had no authority to reduce Appellant's sentence to confinement. *See, e.g.*, *United States v. Lamica*, No. ACM 39423, 2019 CCA LEXIS 257, at *16–17 (A.F. Ct. Crim. App. 14 Jun. 2019) (unpub. op.), *rev. denied*, 79 M.J. 290 (C.A.A.F. 2019).

Reading Appellant's clemency submission in its entire context, Appellant's request for a reduction in his sentence was premised upon the convening authority being willing to infer trial counsel had made a recommendation for clemency or to disregard the absence of such a recommendation. This did not amount to an erroneous statement of law the staff judge advocate would need to correct so much as it amounted to a request to overlook the fact trial counsel had not actually recommended a reduction in Appellant's sentence—a request the staff judge advocate legitimately identified as being "without merit." Even if we construed Appellant's submission as suggesting the convening authority had the ability to reduce Appellant's confinement, we would be unable to find a colorable showing of prejudice because Appellant would have been advising the convening authority that he had more, not less, discretion under the law than he actually had. *See Lamica*, unpub. op. at *16–17; *United States v. Ten Eyck*, No. ACM 39188, 2018 CCA LEXIS 193, at *6–9 (A.F. Ct. Crim. App. 17 Apr. 2018) (unpub. op.).

**D. Sentence Severity**

Making three different arguments, Appellant asserts his sentence is inappropriately severe. First, he argues the military judge erred by denying trial defense counsel's request to instruct the members on the maximum sentence for each specification Appellant had been convicted of. Second, he argues trial counsel's recommended sentence was unreasonable. Third, he points to seven other cases, arguing they demonstrate his sentence is more severe than other sentences for similar offenses. We disagree and resolve this assertion adversely to Appellant.

**1. Additional Background**

*a. Separate Maximum Punishments*

Underlying Appellant's first two arguments is his view that "there was little aggravating evidence surrounding the circumstances of Charge I" (requesting nude photos), and the "gravity of alleged misconduct" centered on Charge II (indecent recording). The maximum sentence for the first charge included 15

years of confinement and the second charge carried 5 years, so Appellant faced a total maximum term of confinement of 20 years.

During Appellant's court-martial, trial defense counsel requested the military judge give a special instruction explaining to the members the maximum punishment for each of the two specifications, but they cited no legal authority for the request. The Government objected to this proposed instruction, and the military judge declined to give it. After a short recess, trial defense counsel again raised the matter, asking the military judge to both take judicial notice of the maximum punishment for each specification and then instruct the members on those limits. The military judge again denied the request, telling counsel the maximum punishments set out in the *Manual for Courts-Martial* do not "independently inform the members as to the seriousness of one offense over another offense." The members were then called, and the military judge orally gave them sentencing instructions, including the direction that the maximum sentence to confinement in the case was 20 years. He further advised the members: "The maximum punishment is a ceiling on your discretion. You are at liberty to arrive at any lesser legal sentence." The court recessed for the evening, and the next morning trial defense counsel asked the military judge to reconsider his earlier ruling, pointing to three cases in support of their request: *United States v. Gutierrez*, 11 M.J. 122 (C.M.A. 1981); *United States v. Barnes*, 29 C.M.R. 487 (C.M.A. 1960); and *United States v. Green*, 29 C.M.R. 294 (C.M.A. 1960). In requesting reconsideration of the military judge's ruling, trial defense counsel argued the Rules for Courts-Martial did not preclude instructing the members on separate maximum punishments, and that such an instruction was warranted in the face of the trial counsel's recommendation of a 12-year sentence to confinement, which trial defense counsel characterized as a request for "seven years for a one-time request of a nude picture." Trial defense counsel argued the members were "not going to realize they might be imposing an unnecessarily severe punishment for the offense they actually convicted [Appellant] of." The military judge summarily denied this reconsideration request.

### b. Trial Counsel's Sentence Recommendation

Related to the argument above, Appellant takes issue with the fact trial counsel asked the members to sentence Appellant to 12 years of confinement. Under Appellant's theory, trial counsel asked the members to sentence him to the maximum of five years for Charge II and seven years for a single incident of indecent language under Charge I. From this proposition, Appellant asserts, "in a case where there is such a wide disparity between the severity of each offense, the military judge should have instructed the members on the maximum confinement for each offense." In the Government's sentencing argu-

ment, trial counsel premised the sentence recommendation of 12 years confinement and a dishonorable discharge on aggravating factors such as the deliberate planning Appellant employed in trying to record ES nude in the bathroom, the fact he compiled the videos into a file named "My Precious" on his computer, his use of his biological children as "props" in his scheme,[15] and his attempts to cover up his offenses by lying to his wife and trying to prevent ES from reporting what had occurred. Trial defense counsel did not object to trial counsel's sentencing argument or recommend a specific period of confinement to the members, but characterized the Government's sentence request as "absolutely unreasonable." Trial defense counsel pointed to the absence of any evidence of "inappropriate touching," that no child pornography offenses were charged, and that Appellant's offenses spanned a relatively short period of time. Trial defense counsel conceded the recordings Appellant had captured were "distressing," but argued they had been deleted and that there was no evidence Appellant had viewed them or shown them to anyone.

Prior to trial counsel's argument, the military judge advised the members that trial counsel "may recommend that [they] consider a specific sentence," but that such a recommendation "is only his individual suggestion[ ] and may not be considered as the recommendation or opinion of anyone other than" trial counsel.

### c. Sentence Comparison

Appellant faced a maximum sentence of dishonorable discharge, confinement for 20 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The members sentenced Appellant to be discharged with a bad-conduct discharge, confined for five years, reduced in grade, and to forfeit the maximum amount of pay and allowances permitted—the last of which the convening authority did not approve.

Appellant asks us to compare his sentence to seven other particular cases, which he suggests demonstrate his sentence to five years of confinement is "excessively severe punishment for these offenses."[16] Of the seven cases, five involved guilty pleas, and one of those guilty-plea cases was a special court-martial. The adjudged sentences in those cases range from 6 months of confinement to 48 months (the 48-month sentence was reduced to 18 months by

---

[15] For example, Appellant would bring his young son into the bathroom while ES was in the shower to brush his son's teeth.

[16] Each of these cases has been the subject of appellate review, and the information cited by Appellant is contained in publicly available court opinions.

operation of a pretrial agreement in exchange for a guilty plea). Appellant identifies nothing in particular connecting these seven cases to his case other than his assertion that they are "similar."

### 2. Law

#### a. Unitary Sentencing

At the time of Appellant's court-martial, sentencing was strictly unitary under R.C.M. 1002(b) which directed courts-martial to "adjudge a single sentence for all the offenses of which the accused was found guilty." This rule prohibited the imposition of separate sentences for each finding of guilty and required a "single, unitary sentence covering all of the guilty findings in their entirety." *Id.* Military judges are required to instruct members on "the maximum authorized punishment that may be adjudged." R.C.M. 1005(e)(1). The discussion to that rule explains the maximum punishment is the total punishment permitted "for each separate offense of which the accused was convicted" unless the court-martial has a lower jurisdictional limit. R.C.M. 1002(b), Discussion.

We review a military judge's declination to give a requested instruction for abuse of discretion by asking: (1) whether the requested instruction is correct; (2) whether it is otherwise substantially covered by other instructions given by the military judge; and (3) whether the requested instruction "is on such a vital point" that its omission deprived Appellant of a defense or seriously impaired its effective presentation. *United States v. Carruthers*, 64 M.J. 340, 346 (C.A.A.F. 2007) (citation omitted).

#### b. Sentence Appropriateness

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to determine sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

Sentence comparison with other cases is only called for in "those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (citations omitted). An appellant has the burden of establishing other cases are both "closely related" (for example, when they involve co-actors, a common scheme, or other direct nexus) and that his sentence is "highly disparate." *Id.* If an appellant meets his burden, the Government must then "show that there is a rational basis for the disparity." *Id.*

### 3. Analysis

#### a. Unitary Sentencing

Because the practice of unitary sentencing applied to Appellant's court-martial, the members could have sentenced him to the maximum sentence authorized. Appellant's theory, as we understand it, is that by not instructing the members on the maximum sentences for the individual charges, the members did not appreciate the relative severity of the charges. As an initial matter, we note this is not the first case in which a party at trial desired to make the members aware of the maximum sentences for individual offenses, and we are unaware of any legal authority endorsing the practice, much less requiring it.[17]

The cases cited by Appellant do not support his claim of error. In *Gutierrez*, the military judge had—without objection—advised the members of the maximum imposable punishment for each offense. 11 M.J. at 122. The United States Navy Court of Military Review held this was error based upon their interpretation of a *Manual for Courts-Martial* provision which was not included in the 1984 *Manual*, and has not been revived in subsequent *Manual* versions. *Id.* On appeal, the United States Court of Military Appeals found the Navy court's interpretation of the provision was flawed and that the provision

---

[17] *See, e.g.*, *United States v. Jimenez*, No. ACM 39200, 2018 CCA LEXIS 304, at *26 (A.F. Ct. Crim. App. 20 Jun. 2018) (unpub. op.) (military judge did not err in permitting the defense to attach the maximum sentences for each offense to the appellant's unsworn statement); *United States v. Garcia*, 57 M.J. 716, 728 (N.M. Ct. Crim. App. 2002), *rev'd on other grounds*, 59 M.J. 447 (C.A.A.F. 2004) (military judge did not err in allowing trial counsel to argue specific sentences for specific offenses while prohibiting trial counsel from advising the members of the maximum sentence for each offense); *United States v. Cochran*, No. ACM 30714, 1996 CCA LEXIS 136, at *4–5 (A.F. Ct. Crim. App. 29 Apr. 1996) (unpub. op.) (finding no plain error, but concluding it was "very misleading and objectionable" when trial counsel, *inter alia*, advised the members of the maximum punishment for each offense instead of seeking "an appropriate unitary sentence"), *aff'd*, 46 M.J. 173 (C.A.A.F. 1996).

did not serve to preclude military judges from advising members by "individualized instructions followed by a total which does not exceed the jurisdictional limit of the court-martial." *Id.* at 124.

The Court of Military Appeals did not conclude advising members as to individual maximum sentences was required or even advisable, only that doing so was not prohibited by the law in force at the time. *Id.* In any event, because the *Gutierrez* opinion was based on a provision which has not been part of military jurisprudence for decades, we conclude it has limited applicability to Appellant's case. Even giving the case's authority its broadest reach, it stands for the proposition that the Navy court was wrong to issue a blanket prohibition on instructing members of the maximum punishments for separate offenses, not that military judges ought to do so or that such instructions must be given upon request. We interpret this ruling as preserving military judges' discretion to decide whether or not to give an instruction as to the separate punishments.[18] In Appellant's case, the military judge declined to give the requested instruction, and *Gutierrez* does not indicate that ruling was in error.

The other cases cited by Appellant support our assessment of *Gutierrez* rather than Appellant's position. In *Barnes*, the Court of Military Appeals held that the special court-martial president had not erred in advising the members as to the maximum punishment for separate offenses. 29 C.M.R. at 488. The opinion, like *Gutierrez*, did not state the practice was required or that it was one that should be adopted. *Green*, on the other hand, is simply inapplicable to Appellant's case, as *Green* involved a court-martial president advising the members of an offense's maximum punishment when that maximum punishment exceeded the jurisdictional limit of the special court-martial the appellant was being tried by; the Court of Military Appeals concluded this was error, and the members should have only been advised of the court's lower jurisdictional limit. 29 C.M.R. at 295.

We find Judge Everett's concurrence in *Gutierrez* instructive, where he suggested that "advice to the court members about the maximum punishments for the separate offenses tends to confuse them and divert them" from their requirement "to pronounce a single sentence." 11 M.J. at 125 (Everett, C.J., concurring). We are similarly skeptical of the utility of instructing members on the maximum sentences of individual offenses in our current justice system which requires the members adjudge a unitary sentence, but we leave the determination of whether to give such an instruction to the sound discretion of

---

[18] *See also United States v. Johnston*, NMCM 84 1910, 1984 CMR LEXIS 3393, at *1 (N.M.C.M.R. 31 Oct. 1984) (per curiam) (unpub. op.) (concluding such an instruction is permissible, but "the decision to give or not to give the instruction rests within the military judge's discretion").

trial judges. We conclude Appellant has failed to show his requested instruction was on such a vital point that it deprived him of a fair hearing or that the correct sentencing principles were not covered by the other instructions given by the military judge. Therefore, the military judge here did not abuse his discretion in declining to give the Defense's requested instruction.

### b. Trial Counsel's Sentence Recommendation

Because trial defense counsel did not object to trial counsel's sentence recommendation at trial, Appellant has forfeited the issue, and we review for plain error. *See United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007). Trial counsel's request that the members sentence Appellant to 12 years of confinement was well within the maximum of 20 years authorized by the UCMJ. Appellant has cited no legal authority prohibiting trial counsel from making the recommendation they did, and we are aware of none. We further note Appellant was sentenced to five years of confinement—substantially less than the amount trial counsel recommended. In addition, Appellant's adjudged sentence undercuts his argument that the members were somehow led astray by not knowing the maximum sentence for each offense given that Appellant was eligible to receive a sentence of five years for the indecent recording charge alone. Moreover, as our sister court has noted in a case wherein an appellant made a similar argument on appeal,

> We do not believe it proper—or wise—to try and untangle from a unitary sentence what each part of a non-unitary sentence may have been and then determine whether each constituent part is "appropriate." Rather, our duty is a holistic one, to determine whether, on the basis of the entire record, the entire sentence is appropriate given both the offenses and the offender.

*United States v. Gallegos*, ARMY 20139026, 2016 CCA LEXIS 462, at *13–14 (A. Ct. Crim. App. 20 Jun. 2016) (unpub. op.). We conclude trial counsel's argument on this point does not amount to error, plain or otherwise.

### c. Sentence Appropriateness

Appellant points to seven other cases in support of his assertion that his sentence is inappropriately severe. Even if we were to conclude those cases involved offenses similar to Appellant's, he has not demonstrated any connection between those cases and his. Moreover, the cases do not appear to be closely related to his in any sense, especially in light of the fact that five of the seven cases were guilty-plea courts-martial wherein the accused potentially received lower sentences based upon their acceptance of responsibility for their conduct. Even in the face of pleading guilty, one of the accused was adjudged a sentence including confinement for 48 months, 12 months less than Appellant received.

While Appellant seeks to portray his offenses as minor or unaggravated, we take a different view. Appellant repeatedly went to lengths to hide a camera in his bathroom in order to surreptitiously capture videos of his nude 12-year-old stepdaughter. He then worked to compile the footage he took into a single file titled "My Precious" for unspecified purposes. Appellant's pattern of entering the bathroom while ES was showering—but only when her mother was out of the house—has not escaped us, nor has the incident in which Appellant held the camera over the shower curtain and subsequently employed the claim it was all a joke. This conduct strikes us not as separate and unrelated events, but rather a pattern of Appellant seeking to normalize both his presence in the bathroom while ES was in the shower as well as his use of the video camera in there. Regarding Appellant asking ES to send him naked pictures of herself for his upcoming deployment, one could interpret that episode as a momentary lapse of judgment. Alternatively, one could view this request as another step in an ongoing effort to erode normal adult-child boundaries and to establish another avenue by which Appellant could obtain nude images of his stepdaughter. Just as disconcerting, Appellant's request that ES send him naked pictures sought to turn ES into a conscious participant in his misconduct.

Appellant was sentenced to one quarter of the confinement he was subject to, the members adjudged a bad-conduct discharge instead of a dishonorable discharge, and the convening authority later disapproved all the adjudged forfeitures. Considering Appellant, the seriousness of the offenses of which he was convicted, his military record, and the matters he submitted in his case in extenuation, mitigation, and clemency, we conclude his approved sentence is not inappropriately severe.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court