# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

v.

## Solomon R. FLORES
### Chief Culinary Specialist (E-7), U.S. Coast Guard

## CGCMG 0382
## Docket No. 1474

## 11 August 2022

General court-martial sentence adjudged on 5 February 2021.

| | |
|---|---|
| Military Judge: | CDR Tamara S. Wallen, USCG |
| Appellate Defense Counsel: | Ms. Tami L. Mitchell, Esq. (argued) |
| | CDR Jeffrey G. Janaro, USCG |
| Appellate Government Counsel: | LCDR Daniel P. Halsig, USCG (argued) |

## BEFORE
## McCLELLAND, HAVRANEK & BRUBAKER
Appellate Military Judges

BRUBAKER, Judge:

A general court-martial of members with enlisted representation convicted Appellant, contrary to his pleas, of one specification of abusive sexual contact and one specification of obstructing justice, in violation of Articles 120 and 134, Uniform Code of Military Justice (UCMJ) (2016). The members sentenced Appellant to confinement for ten months, reduction to E-1, and a dishonorable discharge. The convening authority approved the sentence, and judgment was entered accordingly.

Appellant raises eight assignments of error, paraphrased as follows:

(1) There is legally and factually insufficient evidence supporting Appellant's conviction for abusive sexual contact.

(2) There was a material variance between what Appellant was charged with—abusive sexual contact by causing bodily harm—and the evidence presented at trial—abusive

sexual contact of a person incapable of consenting due to impairment by alcohol—that violated his due process right to not be convicted of an offense with which he was not charged.

(3) The military judge erred in instructing the members to consider the complaining witness's level of intoxication in determining whether she was "competent" to consent, because her "competence" was not an issue to be decided by the court.[1]

(4) The trial counsel committed improper argument by misstating the law on consent.

(5) The military judge erred in permitting expert testimony on "clusters of symptoms" experienced by "victims" of "sexual trauma," and the "statistics" of sexual assault cases that involve alcohol.

(6) Appellant's trial defense counsel were ineffective for failing to cross-examine the complaining witness about her prior testimony at Appellant's previous court-martial, or to otherwise introduce her prior testimony.

(7) This Court should grant relief for excessive post-trial delay.[2]

(8) There is legally and factually insufficient evidence supporting Appellant's conviction for obstructing justice.[3]

We conclude there was no prejudicial error and affirm.

## Background

In July 2017, Seaman (SN) M.W. was in her first tour in the Coast Guard and assigned to the USCGC *Sherman*.[4] At the time, she was doing a rotation in the cutter's galley. Appellant, a Chief Petty Officer, was her second-level supervisor.

---

[1] We heard oral argument on issues (2) and (3).

[2] Consistent with *United States v. Tucker*, 82 M.J. 553, 570 (C.G. Ct. Crim. App. 2022), we conclude there was no facially unreasonable delay. Even were we to assume otherwise, we would still conclude there was no due process violation and decline to grant relief. *See United States v. Moreno*, 63 M.J. 129, 135–36 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

[3] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We conclude there is legally and factually sufficient evidence to support Appellant's conviction for obstructing justice. *See United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019); *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

[4] By the time of this trial, she had been advanced to Petty Officer Third Class, but for simplicity, we refer to her throughout this opinion by her rate at the time of the incident.

The *Sherman* made a port call to Nome, Alaska. Because the pier was too small, the *Sherman* anchored offshore and shuttled crewmembers back and forth for liberty. SN M.W. took a small boat ashore. Cutter rules required she have a "liberty buddy," which she had arranged, but her liberty buddy was scheduled to take a later small boat to join her ashore. Having received permission to stay overnight, she checked into the Nome Nugget Inn. By the time her liberty buddy had planned to go ashore, it was determined that no more small boats would go ashore that evening due to sea conditions.

SN M.W. was thus left in a quandary: being ashore without a liberty buddy contrary to cutter rules. She went to the lobby of the Nome Nugget and asked several shipmates what their plans were, but they intended to return to the cutter in the small boat that had brought SN M.W. ashore. She then saw Appellant standing in the lobby, so she reported to him, as her supervisor, that she was there without a liberty buddy. Appellant said it would be okay, to "just stick with him." R. at 479.

SN M.W. and Appellant were having drinks in the hotel's bar when Appellant received a phone call. Another crewmember was too inebriated to board the small boat that was heading back to the cutter and needed a place to stay where someone could keep an eye on him. Appellant offered SN M.W.'s room and told SN M.W. that she could stay in his room in another nearby hotel—though he cautioned her not to tell anyone since it was against regulations. SN M.W. acquiesced because, she testified, he was her Chief, it was a quick solution to help a shipmate out, and, she assumed, there would be a couch in Appellant's room for her to sleep on.

SN M.W. and Appellant then went to assist the inebriated shipmate. They took him to her room, where she gathered her things and brought them to Appellant's room in the other hotel. The layout of his room, however, was "odd, because I had—obviously, I had pictured a couch or somewhere for me to sleep that wasn't the floor or his bed." R. at 488. Feeling "wary" and that she was in a "weird situation," she called her boyfriend for advice. R. at 488–89. Her boyfriend, a fellow Seaman aboard the cutter, told SN M.W. she should not stay with Appellant because he did not trust Appellant and should instead stay with SN (at the time) A.F.—also a male, but one whom SN M.W.'s boyfriend trusted.

3

Heeding her boyfriend's advice, SN M.W. contacted SN A.F., who replied she was welcome to stay in his room, but that he was out with friends and would not be back until later that evening. Appellant shared wine he had in his room with SN M.W., then the two left to go to bars in Nome. SN M.W. testified that at some point in the evening, she went into alcoholic blackout. The last memory she had was being at a bar drinking with Appellant. The next memory was lying on her back on Appellant's bed. She had no pants or underwear on. Appellant was between her legs with his mouth touching her vagina. SN M.W., who testified she did not want Appellant touching her vagina with his mouth, immediately got up, started crying, gathered her things, and left Appellant's room.

Separately, Appellant learned that the Coast Guard Investigative Service (CGIS) planned to investigate another incident, unrelated to SN M.W.'s allegations. In response, he summoned Culinary Specialist Third Class (CS3) D.S. to his office. CS3 D.S., whom Appellant supervised, was a witness to this separate incident. Appellant told CS3 D.S. that CGIS might want to talk to him, and then relayed to CS3 D.S. false points about the incident "just to make sure that I knew what I was going to say as to not get him or me in trouble." R at 612. This formed the basis for the obstructing justice conviction.

### Sufficiency of Evidence: Abusive Sexual Contact

Appellant asserts there is legally and factually insufficient evidence to support his conviction for abusive sexual contact. We review the sufficiency of evidence de novo. Article 66(c), UCMJ; *United States v. Weiser*, 80 M.J. 635, 645 (C.G. Ct. Crim. App. 2020), *petition denied*, 81 M.J. 244 (C.A.A.F. 2021). The standard for legal sufficiency "involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019). Evidence is legally sufficient if, "viewing the evidence in the light most favorable to the prosecution" and drawing "every reasonable inference from the evidence of record in favor of the prosecution," "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up). The phrase "beyond a reasonable doubt" does not "mean that the evidence must be free from any conflict or that the trier of fact may not draw reasonable inferences from the evidence presented." *Id*.

Factual sufficiency, on the other hand, involves a higher threshold. Evidence is factually sufficient if, after weighing the evidence and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).[5]

Appellant specifically contends there is legally and factually insufficient evidence that SN M.W. did not consent to Appellant placing his mouth on her genitalia. Appellant posits that when a putative victim has no memory of the events immediately leading up to the sexual act, the Government, as a matter of law, cannot carry its burden to prove that he or she, in fact, did not consent. Article 120, UCMJ, however, provides to the contrary. It expressly permits a trier of fact to consider not only direct evidence of lack of consent—such as a putative victim's own account—but circumstantial evidence as well. Art. 120(g)(8)(C) ("All the surrounding circumstances are to be considered in determining whether a person gave consent . . . .").[6]

This case, we believe, provides a good example of when there can be sufficient circumstantial evidence to prove a lack of consent even in the face of limited direct evidence. SN M.W. could not provide direct evidence of what immediately preceded Appellant's sexual act because, she testified, from the time she was at a bar with Appellant until realizing Appellant was touching her vagina with his mouth, she was in alcoholic blackout. She said she had experienced blackout before and she was clear that what she meant was that she lacked memory of events during the blackout, but may have been able to communicate and take volitional actions. Hence, she candidly admitted during cross-examination that although she could not remember, it was possible that: she removed her own pants and underwear; she voluntarily got into bed with Appellant; he put his head between her legs because she wanted him to; and he put his mouth on her vulva because she asked him to.

---

[5] Though not applicable to this case, the statutory standard for factual sufficiency has since been amended. *See* FY2021 National Defense Authorization Act (NDAA), P.L. 116-283, 1 January 2021.

[6] *See MCM*, app. 22, Punitive Articles Applicable to Sexual Offenses Committed Between 12 June 2012 and 31 December 2018 at A22-2. This same language survives in the current Article 120(g)(7)(C).

Despite these *possibilities*, it was the Government's theory that they were not *reasonable* possibilities and that SN M.W. did not, in fact, consent. On redirect, SN M.W. catalogued other things it was possible she did while blacked out, like jogging, buying a lottery ticket, or going hiking. But just as she had every reason to believe she did not do any of those things, she was convinced she did not consent to Appellant placing his mouth on her vagina.

The Government supported this theory with what we deem strong circumstantial evidence. First, SN M.W. was a "non-rate" E-3 while Appellant was her E-7 supervisor. SN M.W. attested she had never, within her abilities of recall, had any desire or intent to engage in sexual activity with Appellant, nor had any physical attraction to him. A rational trier of fact could have given credence to these assertions.

Second, a rational trier of fact could have viewed Appellant's actions as a deliberate use of his authority to set the conditions for a sexual assault. When informed of SN M.W.'s lack of a liberty buddy, Appellant told her to "just stick with him," R. at 479, rather than, for instance, telling her she could stick with him until they found a more appropriate liberty buddy. When informed of the drunken shipmate who could not make it back to the cutter, he offered SN M.W.'s room and told her to stay in his room, contrary to regulations, rather than seeking more appropriate alternatives. Appellant then told SN M.W. not to tell anyone because it was against the rules, leading to a level of secrecy and isolation. Although these actions could be viewed as innocent, they also reasonably could be viewed as demonstrating ill intent, an abuse of Appellant's position as SN M.W.'s supervisor, and deliberate manipulations to get SN M.W., whether she desired it or not, to spend the night with him.

Third, SN M.W.'s actions prior to her blackout were consistent with a person who did not intend or desire to engage in sexual activity with Appellant. Once Appellant told SN M.W. to stay in his room and she realized it did not even have a couch for her to sleep on, she called her boyfriend to discuss what to do. Her boyfriend suggested she contact a fellow E-3 whom, although a male, the boyfriend trusted. SN M.W. took this advice and texted her shipmate: "Can I please stay in your room tonight? I found myself in a sticky situation and I need a place to stay[.]" "With someone I trust[.]" PE 5 at 2.

6

Finally, SN M.W.'s actions *after* her blackout were also consistent with a lack of consent. She testified that her next memory was Appellant touching her vagina with his mouth, that she did not want him touching her vagina with his mouth, so she immediately got up, started crying, grabbed her things, and left the room as soon as she could.

The same rationale applies to whether Appellant had a reasonable mistake of fact as to consent. Although SN M.W. was, in effect, not available as a witness regarding what precisely her actions were immediately preceding the sexual act, the members were free to conclude from all the evidence, as already discussed, that Appellant did not reasonably believe SN M.W. consented.

Considering the evidence presented in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that SN M.W. did not consent to Appellant placing his mouth on her vagina and that Appellant did not reasonably mistake otherwise. Making allowances for not having personally observed the witnesses, we too are convinced beyond a reasonable doubt. The evidence of abusive sexual contact is, accordingly, both legally and factually sufficient.

## Variance

Appellant next contends that although he was charged with abusive sexual contact by causing bodily harm, he was prosecuted and convicted under the uncharged theory of abusive sexual contact of a person incapable of consenting due to impairment by alcohol. He asserts this variance between pleading and proof violated his due process rights.

"The due process principle of fair notice mandates that an accused has a right to know what offense and under what legal theory he will be convicted. The Due Process Clause of the Fifth Amendment also does not permit convicting an accused of an offense with which he has not been charged." *United States v. Tunstall*, 72 M.J. 191, 192 (C.A.A.F. 2013) (cleaned up).

Abusive sexual contact by causing bodily harm is a distinct legal theory from abusive sexual contact of a person incapable of consenting. *Weiser*, 80 M.J. at 640–41. As we cautioned in *Weiser*, "to avoid the risk of variance, practitioners and military judges must be vigilant of the difference between a theory that a putative victim *did not, in fact*, consent (bodily harm) and that a putative victim was *legally unable* to consent (e.g., incapacitated or sleeping)." *Id*. at 641.

Appellant relies on *Weiser* to support his position. There, we ultimately found no variance, but only after noting that the "close evidentiary interplay among the three theories of liability" made it "a close call." *Id*. at 640. Appellant posits that if *Weiser* was a close call, the record in his case should garner even less confidence that he was tried and convicted under the theory with which he was charged. We conclude to the contrary and wish to emphasize two points.

First, presenting evidence of the effects of alcohol on a putative victim is permissible in a "did not consent" case and does not, by itself, transform it into a "could not consent" case—as long as we can be satisfied that the Government prosecuted the case under a "did not consent" theory. In determining whether a putative victim actually consented, the trier of fact is entitled to consider "[*a*]*ll* the surrounding circumstances," including evidence of alcohol consumption. Art. 120(g)(8)(C) (emphasis added); *Weiser*, 80 M.J. at 642.

Second, although "did not consent" theories of liability are distinct from "could not consent" theories, there still may be overlap between them, and one set of circumstances may tend to prove either. *See Weiser*, 80 M.J. at 642, n.6. Thus, even when there is evidence of significant intoxication, the Government may opt to charge a "did not consent" theory—as long as it can affirmatively prove an actual lack of consent.

Our concern in *Weiser*, instead, centered on whether the trial counsel's focus on and comments about photographs appearing to show an incapacitated victim unwittingly invited the members to convict based on an uncharged "could not consent" theory of liability. *Weiser*, 80 M.J. at 640. This is what made the case close for us. Still, balancing this with other factors— including the presentation of "affirmative evidence of an actual lack of consent," the trial

counsel's express disavowal of uncharged theories, and the military judge's proper instructions on the charged theory of liability—we concluded there was no due process violation. *Id.* at 641–42.

Here, although SN M.W. could not remember a block of time due to overconsumption of alcohol, there was no such evidence of an inability to consent. We are more confident—not less—that Appellant was prosecuted and convicted under the charged "did not consent" theory. SN M.W. herself was clear that her memory lapse did not mean she was claiming she was asleep, unconscious, or otherwise unable to consent. Instead, she conceded she had experienced periods of alcoholic blackout before where she walked places and had conversations she did not remember. She did not contend she *could not* have consented. To the contrary, she conceded that because she could not remember, it was possible she did. But, as addressed in the sufficiency of the evidence section, she did not put credence in this possibility and continued to maintain that she did not, in fact, consent.

The trial counsel, too, focused his presentation of evidence and argument on an actual lack of consent without impliedly inviting the members to convict on an uncharged theory. He addressed evidence that alcohol affected SN M.W., but it was in the context of explaining her "memory fade." R. at 973. He went on to emphasize that the members must find that Appellant placed his mouth on SN M.W.'s vagina without her consent, then pointed to evidence adduced during the trial supporting that SN M.W. did not, in fact, consent.

Finally, the military judge, heeding our counsel to be vigilant of the distinction between "did not" and "could not" consent theories, not only provided instructions on the "did not" theory we found proper in *Weiser*, 80 M.J. at 642, but added the following tailored instruction:

> Evidence of SN M.W.'s level of intoxication is only relevant as to whether she did in fact consent to any sexual activity as alleged. The Government must prove, not that SN M.W. was incapable of consenting by alcohol intoxication, but rather that (1) the charged sexual act occurred between the accused and SN M.W. and (2) that SN M.W. did, in fact, not consent to that sexual act.

R. at 946; App. Ex. LXXIX at 2. This helped ensure the members put evidence of intoxication into its proper context and focused them on the correct theory of liability.

The members returned a verdict of guilty to abusive sexual contact by causing bodily harm without exception or substitution. We conclude there was no variance between pleading and proof and that Appellant therefore was not deprived of due process.

## Instructions

Appellant asserts the military judge erred by instructing "that consent can only be given by someone who is 'competent,' an 'incompetent' person cannot consent, and that the panel should consider SN M.W.'s intoxication as part of the 'totality of the circumstances' in considering whether she consented . . . ." Appellant's Br. at 8. Beyond our conclusion, expressed above, that the military judge's instructions were, on the whole, effective in focusing the members on the charged theory of liability, we conclude that Appellant waived this objection.

Prior to instructing the members on the findings, the military judge solicited and received proposed instructions from both parties. Appellant requested the standard instruction for abusive sexual contact, with the following novel addition:

> *Whether or not SN M.W. was competent and therefore capable of consenting to sexual activity based on her level of intoxication is not before you.* Evidence of SN M.W.'s level of intoxication is only relevant as to whether she did in fact consent to any sexual activity as alleged. The Government must prove, not that SN M.W. was incapable of consenting by alcohol intoxication, but rather that (1) the charged sexual act occurred between the accused and SN M.W. and (2) that SN M.W. did, in fact, not consent to that sexual act.

App. Ex. XXX at 1–2 (emphasis added).

After considering each side's submissions, the military judge provided counsel with her draft instructions. It included a tailored instruction adopting Appellant's submission, only omitting the italicized portion. App. Ex. LXXIX at 2.

In a session outside the presence of the members, the military judge expressly noted the novel instruction Appellant had proposed and asked, "You understand which portions we've taken, and which portions we haven't?" Trial defense counsel responded, "Yes, Your Honor." R.

at 937. Then, after reviewing the remainder of the instructions, she asked, "Do either side have any objection to those instructions?" Trial defense counsel responded, "No objection, Your Honor." R. at 940. After reading the instructions to the members, she reiterated, "I'll ask counsel again, have you had an opportunity to review . . . the instructions as they're going to be presented to the members . . . ?" Trial defense counsel responded in the affirmative. The military judge then asked, "OK, any objections to those?" Trial defense counsel responded, "No objection, Your Honor." R. at 967.

This was waiver. *United States v. Rich*, 79 M.J. 472 (C.A.A.F. 2020), is strikingly similar to this case and thus instructive. There, the military judge received proposed findings instructions from both parties; trial defense counsel indicated he was requesting an instruction on mistake of fact. *Rich*, 79 M.J. at 474. However, when the military judge provided his draft instructions back to the parties, he excluded a mistake of fact instruction. *Id.* Trial defense counsel made an unrelated objection to the military judge's draft, but indicated there were no other objections. *Id.* at 474–75. The court held that the trial defense counsel's dialogue with the military judge "clearly demonstrates that Appellant affirmatively waived any claim of instructional error in this case." *Id.* at 476. So too here. "By expressly and unequivocally acquiescing to the military judge's instructions, Appellant waived all objections to the instructions . . . ." *United States v. Davis*, 79 M.J. 329, 332 (C.A.A.F. 2020) (cleaned up). Further, although Courts of Criminal Appeals may, in appropriate circumstances, ignore waiver, *United States v. Chin*, 75 M.J. 220, 222 (C.A.A.F. 2016), we decline to do so here.

### Improper Argument

During his rebuttal argument on the findings, the trial counsel stated:

> Members, the defense wants you to believe that [SN M.W.] consented. And they misstate consent. They describe it as driving down a road and the absence of stop signs. On this point, I will ask that you read the judge's instructions. Lack of verbal resistance does not constitute consent. Read those instructions. [SN M.W.] needs to give an affirmative appraisal of a desire to engage in the conduct. It can be non-verbal, but it has to be affirmative.

R. at 1004–05.

Trial defense counsel objected on the stated basis of "burden shifting." R. at 1005. The military judge responded:

> Okay, so I'll just remind the members that the burden is with the government. The defense does not need to present any evidence to you or to prove anything. But I'll also state that to the extent that anything that conflicts from their closing arguments and my instructions to you on the law, you must follow my instructions regarding consent. Please continue.

R. at 1005.

Appellant now asserts this was improper argument, not on the basis raised at trial—shifting the burden to the Defense—but that it misstated the law on consent. Because he did not raise that objection at trial, we review for plain error. Appellant thus bears the burden of establishing: (1) there was error; (2) that was plain or obvious; and (3) resulted in material prejudice to his substantial rights. *United States v. Bodoh*, 78 M.J. 231, 236 (C.A.A.F. 2019).

Misstating legal principles during argument is a form of prosecutorial misconduct. *Id.* at 237; *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014). But even when there is prosecutorial misconduct, "relief is merited only if that misconduct actually impacted on a substantial right of an accused (*i.e.,* resulted in prejudice)." *United States v. Pabelona*, 76 M.J. 9, 12 (C.A.A.F. 2017) (cleaned up). We assess prejudice by considering three factors: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005). Reversal is only appropriate if "the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id.*

Here, even were we to assume error, Appellant fails to demonstrate prejudice. The severity of the misconduct, if any, is low. It was an isolated statement in the course of a seven-day trial. The trial counsel was trying to rebut trial defense counsel's argument that consent was like driving down a road and, in essence, unless there is a "big, red sign" with "white letters in the middle, S-T-O-P, stop sign," then you can keep driving down the road—there is consent. R. at 987–88. Though the trial counsel's articulation may have gone too far in the other direction, it

was in the context of correctly pointing out that the law requires more than the absence of signs of resistance. *See* Art. 120(g)(8)(A), UCMJ ("The term 'consent' means a freely given agreement to the conduct at issue by a competent person. . . . Lack of verbal or physical resistance does not constitute consent.").

In response to the trial counsel's statement, the military judge, sua sponte, went beyond the scope of the objection to remind the members that, as she had told them previously, if there were any conflicts between her instructions and counsel's statements, they must follow her instructions. This was an appropriate and, we assess, effective measure to cure any misstatement of the law—by *both* counsel.

Finally, we see no evidence, on this record, that the trial counsel's isolated statement impacted the weight of the evidence or the member's assessment of whether SN M.W. freely agreed to the sexual conduct. We are confident that the members convicted on the basis of the evidence alone. Appellant has shown no prejudice.

**Expert Testimony**

Appellant asserts the military judge erred by permitting expert testimony about sexual trauma and the prevalence of alcohol as a factor in sexual assault cases. We disagree.

Major J.C., an expert in clinical and forensic psychology, testified that although there is no standard response to sexual trauma, there are four "clusters of symptoms" that "guide a general understanding of how people might respond" to sexual trauma: (1) avoidance; (2) negative alterations of cognition and mood; (3) intrusive thoughts; and (4) alterations and arousal, such as exaggerated startle response. R. at 722. Although he had not examined SN M.W., he testified, based on reviewing records and observing the trial, that he observed symptoms of sexual trauma in SN M.W. He also testified that as a subset of avoidance, delayed reporting of sexual assaults is common. Finally, he testified that alcohol is common in sexual assault cases, estimating that alcohol and sexual assault are "coexisting elements" in over sixty percent of cases. R. at 737.

Military Rule of Evidence (M.R.E.) 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

 "As gatekeeper, the trial court judge is tasked with ensuring that an expert's testimony both rests on a reliable foundation and is relevant." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The following factors, delineated in *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993), continue to guide decisions on whether to admit expert testimony:

> (1) the qualifications of the expert;
>
> (2) the subject matter of the expert testimony;
>
> (3) the basis for the expert testimony;
>
> (4) the legal relevance of the evidence;
>
> (5) the reliability of the evidence; and
>
> (6) whether, under M.R.E. 403, the probative value of the testimony outweighs other considerations.

*United States v. Henning*, 75 M.J. 187, 191 (C.A.A.F. 2016).

When reviewing a military judge's admission of expert testimony, we use a two-tiered approach. First, we apply a de novo standard to determine whether the military judge properly performed the required gatekeeping function. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014). This is largely a procedural question of whether the military judge considered

relevance and reliability of the testimony within the correct framework. *Id*. If so, we then apply a far more deferential abuse of discretion standard to the ruling itself, only overturning it if "it is manifestly erroneous." *Henning*, 75 M.J. at 191 (quoting *United States v. Griffin,* 50 M.J. 278, 284 (C.A.A.F. 1999)). A military judge enjoys great latitude both in deciding *how* to determine reliability as well as in *whether* to admit expert testimony. *United States v. Billings*, 61 M.J. 163, 167 (C.A.A.F. 2005). An abuse of discretion may occur if the ruling is: (1) based on clearly erroneous findings of fact; (2) influenced by an erroneous view of the law; or, (3) "outside the range of choices reasonably arising from the applicable facts and the law." *Flesher*, 73 M.J. at 311 (quoting *United States v. Miller,* 66 M.J. 306, 307 (C.A.A.F. 2008)).

Military appellate courts have been "resolute in rejecting the admissibility of so-called human lie detector testimony, which we have described as: 'an opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case.' Neither a lay nor an expert witness has the foundation or expertise to opine that an individual is or is not telling the truth." *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007) (quoting *United States v. Kasper,* 58 M.J. 314, 315 (C.A.A.F. 2003)).

Our initial question, then, is less about *how* the military judge performed her gatekeeping role than *whether* she did so within the proper framework. We conclude she did. Although Appellant's motion to exclude Major J.C.'s testimony came after the dates for filing and litigating motions, the military judge paused presentation of evidence to conduct a hearing outside the presence of the members. She allowed voir dire of the witness, heard argument from both sides, and affirmatively ruled from the bench on admissibility. Her ruling did not explicitly review the *Houser* factors, but, within the framework of M.R.E. 702, she addressed Appellant's objections, which contested only the relevance, not the reliability, of Major J.C.'s testimony. *See* App. Ex. LXIX at 2 ("To have [Major J.C.] with his credentials, experience, and knowledge, now mirror SN M.W.'s testimony is not helpful to the members, has low probative value, and would work to the substantial prejudice of [Appellant]."). We are satisfied that she considered Appellant's objection within the correct framework and fulfilled her duty as gatekeeper.

Moving to the second, more deferential part of our inquiry, we conclude the military judge did not abuse her discretion by allowing the testimony. Military courts have long permitted, under appropriate circumstances, testimony about common symptoms of sexual trauma (or "rape trauma") and whether a particular putative victim is exhibiting symptoms consistent with sexual trauma. *See, e.g., United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010); *Houser*, 36 M.J. at 392; *United States v. Harrison,* 31 M.J. 330, 332 (C.M.A. 1990) ("An expert may testify as to what symptoms are found among children who have suffered sexual abuse and whether the child-witness has exhibited these symptoms.").

This case, in fact, is quite similar to *Houser*. There, the expert also had not examined the victim. *Houser,* 36 M.J. at 393. Nonetheless, the court, noting that "an expert's opinion may be based upon personal knowledge, assumed facts, documents supplied by other experts, or even listening to the testimony at trial," concluded the expert had a sufficient basis to testify to common symptoms of rape trauma syndrome and whether the victim exhibited symptoms consistent with it. *Id.* at 399. Marching down what we now call the *Houser* factors, the court concluded each was met and that admission of the testimony was not an abuse of discretion. *Id.* at 398–400.

Likewise here. Major J.C.'s qualifications are not reasonably in dispute. When asked, trial defense counsel had no objection to recognizing him as an expert in clinical and forensic psychology. His testimony, far from embracing a novel scientific theory, paralleled that of experts long considered reliable by military courts. *See, e.g., id.*; *United States v. Carter*, 26 M.J. 428, 429 (C.M.A. 1988) (holding that rape-trauma-syndrome evidence meets the requirements for admissibility and is probative on the issue of consent by the victim); *United States v. Bostick*, 33 M.J. 849, 853 (A.C.M.R. 1991). Major J.C.'s specialized knowledge was helpful to the members to understand counterintuitive behaviors and common symptoms of a person suffering from trauma associated with sexual assault. He was clear he was not testifying about whether SN M.W. was actually assaulted or attesting to her credibility. Just as in *Houser*, this testimony had probative value that was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members. *See Houser*, 36 M.J. at 399–400.

Nor was it an abuse of discretion to permit Major J.C. to testify that a majority of sexual assault cases involve alcohol. Appellant, citing *United States v. Brooks*, asserts this "constituted impermissible testimony about SN M.W.'s credibility. . . ." Appellant's Br. at 26. But while *Brooks* also involved "percentage" testimony, *Brooks*, 64 M.J. at 329, the similarities end there. The expert in *Brooks* testified that false claims of sexual abuse by children was at "about a five percent level." *Id*. at 327. The court, saying this was "credibility quantification testimony," concluded it "invaded the province of the court members to determine the credibility of the victim and violated the limitations of M.R.E. 608 on admissible testimony relating to truthfulness." *Id*. at 329.

Major J.C.'s testimony, in contrast, did not approach the type of "human lie detector testimony" at issue in *Brooks*. *Id.* at 328. He testified that alcohol and sexual assault are "coexisting factors" in over sixty percent of cases, explaining this enters his analysis as "just something I'm always keeping in mind in terms of how it might be in play, either in terms of how it affected an individual's perception of events or even perceptions of themselves in context." R. at 737. This in no way quantified the probability that SN M.W. was being truthful or indicated that he, as an expert, considered her credible. Unlike in *Brooks*, his testimony was not credibility quantification testimony.

In sum, we conclude that the military judge did not abuse her discretion by permitting Major J.C.'s testimony.

### Ineffective Assistance of Counsel

Lastly, Appellant asserts his trial defense counsel were ineffective in their cross-examination of SN M.W. To prevail on this claim, Appellant must show: (1) that his counsel's performance was deficient, that is, fell below an objective standard of reasonableness; and (2) that but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *United States v. Akbar,* 74 M.J. 364, 371 (C.A.A.F. 2015) (citing *Strickland v. Washington,* 466 U.S. 668 (1984)). This is a high bar. *Id.* To establish the first prong, he must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. To

establish the second prong, he must show that but for the deficient performance, there is a reasonable probability that the outcome would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

In Appellant's first trial, which ended in a mistrial, SN M.W. conceded in cross-examination that alcohol sometimes causes her to do things she would not otherwise do if sober. Trial defense counsel followed up with the following colloquy:

> Q: Would you agree with me that alcohol could have played a role in whether or not you found [Appellant] attractive that night?
>
> A: Yes.
>
> Q: And that alcohol could have played a role in you wanting to stay the night with [Appellant] in Nome?
>
> A: Possibly.

App. Ex. XIII at 89–90.

Appellant now asserts his trial defense counsel for his second trial were ineffective for failing to cross-examine SN M.W. about this prior testimony or to otherwise introduce it. Appellant offers no additional evidence to consider, instead relying on the record to assert that it demonstrates both deficient performance and prejudice. We conclude, without the need for further fact-finding, *see United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997), that the record fails to establish either prong of ineffective assistance of counsel.

Appellant's counsel in his second trial conducted a thorough examination of SN M.W., including the following colloquy:

> Q: [SN M.W.], I want to ask you about possibilities. Now, again, you don't remember anything after leaving the last bar and ending up in [Appellant's] hotel room, but it is possible that you voluntarily walked back to [Appellant's] hotel room?
>
> A: I'm--yes, yes.
>
> Q: It is possible that you chose to walk into Chief Flores' hotel room?
>
> A: Well, my stuff was in there, so it would make sense.

18

Q: It is possible that you took off your own pants?

A: Yes.

Q: It is possible that you took off your own underwear?

A: Yes.

Q: It is possible that you got into that bed, because you wanted to?

A: I wanted to is kind of loose, but, yes.

Q: And it is possible that [Appellant] put his head between your legs because you wanted him to?

A: Sure, yes.

Q: And it is possible that [Appellant] put his mouth on your vulva, because you asked him to.

A: It's possible.

R. at 529–30.

Appellate defense counsel focused on this colloquy when asserting the evidence of abusive sexual contact was insufficient. This makes sense: it is powerful cross-examination—more powerful, in fact, than the tame (in comparison) concession that alcohol "could have played a role" in whether or not she found Appellant attractive or whether she wanted to "stay the night" with him.

Appellant, however, asserts that the prior testimony was important because it was inconsistent with her testimony that she was not attracted to Appellant and did not want to stay with him. We disagree. SN M.W. was consistent that she was testifying to what she could remember, that she was not alleging she was passed out or that it was otherwise impossible she consented, but instead candidly conceded that just about anything was *possible* during the period she was blacked out—to include, as trial defense counsel skillfully elicited in the second trial, the possibility that she *actually consented*. SN M.W. also was clear, however, that she nevertheless

19

did not believe she consented because, among other reasons, in her memory, she had not wanted to stay in Appellant's room, had a boyfriend she cared for, and was not attracted to Appellant.

In determining whether we are convinced of guilt beyond a reasonable doubt, we—as did the members—had to confront this self-conceded possibility that SN M.W., with the influence of alcohol, changed her mind and willingly agreed to sexual activity with Appellant, even if she could not remember doing so. We—as would have the members—considered this alongside the remainder of SN M.W.'s testimony and all other circumstances and ultimately determined that we are, nonetheless, convinced beyond a reasonable doubt that she did not, in fact, consent.

To add to the list of possibilities that alcohol "could have played a role" in whether or not she found Appellant attractive or whether she wanted to "stay the night" with him would add nothing to this calculus. It therefore was reasonable for trial defense counsel to focus on the more powerful concessions they elicited and not regurgitate the prior testimony. Further, there is not a reasonable probability that, had the prior testimony been presented, the outcome would have been different. Accordingly, Appellant fails to demonstrate either prong of ineffective assistance of counsel.

## Decision

We determine that the findings and sentence are correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Chief Judge McCLELLAND and Judge HAVRANEK concur.



For the Court,

Christopher R. Jaramillo
Clerk of the Court